Fred SPIRES, Jr., Plaintiff,

v.

BEN HILL COUNTY, et al.,
Defendants.

David Alan SANDERS, Plaintiff,

v.

BEN HILL COUNTY, et al.,
Defendants.

Ray L. MERCER, Plaintiff,

v.

BEN HILL COUNTY, et al.,
Defendants.

Suzy Stoner MERCER, Plaintiff,

v.

BEN HILL COUNTY, et al.,
Defendants.

Civ. Nos. 88–241–1–MAC(DF), 88–283–1–MAC(DF), 88–350–2–MAC(DF) and 89–161–2–MAC(DF).

United States District Court,
M.D. Georgia,
Macon Division.

Aug. 10, 1990.

J. David Tucker, Jay, Sherrell & Smith, Fitzgerald, Ga., for plaintiffs.

Mary Mendel Katz, Thomas F. Richardson, Chambless, Higdon & Carson, Macon, Ga., Robert W. Chasteen, Jr., Mills & Chasteen, P.C., Fitzgerald, Ga., for defendants.

FITZPATRICK, District Judge.

Plaintiffs Fred Spires, Jr., Ray L. Mercer, David Alan Sanders, and Suzy Stoner Mercer bring this action under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201 *et seq.* (hereinafter "FLSA"), against Ben Hill County and the other named defendants. The plaintiffs seek to recover minimum wage and overtime compensation, liquidated damages, reasonable attorney's fees and the costs of this action. The court granted defendants' motion for consolidation of these actions on September 21, 1989. The consolidated cases were tried before the court sitting without a jury on March 27, March 28, and March 29, 1990. The court has carefully considered the parties' submissions, the statutory law and the relevant case law, and issues its rulings below.

## I. Background

Defendant Ben Hill County, through the Ben Hill County Emergency Medical Services (EMS) facility located in Fitzgerald, Ben Hill County, Georgia, provides ambulance and emergency services in Ben Hill County. The individually named defendants are persons who were serving as Ben Hill County Commissioners at the time plaintiffs filed suit. Ben Hill County employs, or has employed, the plaintiffs as emergency medical technicians (EMTs).

As certified EMTs, the plaintiffs have completed a 220 hour program required by Georgia law for EMT training; the plaintiffs have passed both written and practical state exams in becoming qualified. Plaintiffs have received training in the rescue of accident victims, including training in how to use the Hurst tool, also known as the "jaws of life," to extricate persons trapped in vehicles. Plaintiffs have also received training in the treatment of fire and crime victims, firefighters and law enforcement personnel. Two EMTs in one ambulance go out on each call. No particular EMT is designated as a driver and the EMTs can swap out between driver and attendant.

Plaintiffs worked on a rotation basis comprised of one 24–hour shift on-duty, one 24–hour shift on-call, and one 24–hour shift off-duty until mid–1988. After that time, the EMTs' rotation consisted of 24 hours on-duty, 24 hours on-call, and 48 hours off-duty. While on-call, an EMT has to be able to report to the EMS facility clean, sober, and in a uniform or coverall, within ten minutes of being called. EMTs received $10 per day "on-call pay."[1] If on-call half a day, an EMT got paid $5, half the daily rate. If an EMT is called in while on-call, he or she also receives a straight hourly rate for the actual time worked.

Plaintiff Spires' claim runs from July 26, 1986 until the present, unless the court finds defendants' violation, if any, was willful, in which case his claim would commence on April 15, 1986. Plaintiff Spires

---

1. On-call pay was recently increased to $16.50 per day.

began his employment with the Ben Hill County EMS as a radio dispatcher. Spires eventually obtained his EMT license and worked part-time as an EMT and the majority of the time as a dispatcher. Plaintiff Sanders' claim runs from September 2, 1986 to the present, unless the court finds defendants' violation, if any, was willful, in which case his claim would commence on April 15, 1986. Sanders is a basic EMT and a shift captain.[2]

Plaintiff Suzy Mercer's claim runs from May 9, 1987 to April 29, 1988, unless the court finds defendants' violation, if any, was willful, in which case her claim would commence on the date she was first employed by defendants, October 7, 1986. Suzy Mercer was an EMT with the Ben Hill County EMS. Plaintiff Ray Mercer's claim runs from November 14, 1986 to March 24, 1989, unless the court finds defendants' violation, if any, was willful, in which case his claim would commence on April 15, 1986. Ray Mercer was an EMT and a shift captain.

Approximately a year after these suits were filed, in June of 1989, the Ben Hill County Board of Commissioners delivered checks for overtime compensation to the plaintiffs. Plaintiff Spires received $935.98; plaintiff Sanders received $2,887.20; plaintiff Suzy Mercer received $781.80; and plaintiff Ray Mercer received $2,619.23. Attached to each check was a memorandum stating "Ben Hill County has received a ruling from the Labor Department which resolves certain issues concerning the computation of overtime compensation for EMS employees. The attached check represents overtime compensation which the county has computed to be due you." Plaintiff's Exhibits, 31 & 32.

II. Defendants' Motion to Withdraw Stipulation

On March 23, 1990, defendants filed a motion to withdraw paragraph 5 of the stipulation attached as part of the pretrial order. Paragraph 5 of the stipulation states: "Ben Hill County, Georgia, has been since April 15, 1986, and is now subject to the provisions of 29 U.S.C. §§ 201 et seq. with respect to the employment of the plaintiffs...." Defendants now contend that they are exempt from coverage under the Act under section 13 of the Act. 29 U.S.C. § 213(b)(1).

■ The court reserved ruling on defendants' motion at trial,[3] noting that if the stipulation goes to a question of law, the court would be hesitant to hold a party to a misstatement of the law and would be more inclined to grant defendants' motion. Plaintiffs argue that the stipulation is one of fact, not of law. The court disagrees. The applicability of the section 13(b)(1) exemption is a question of law. *Jones v. Giles*, 741 F.2d 245, 248 (9th Cir.1984); *see Benson v. Universal Ambulance Service, Inc.*, 675 F.2d 783 (6th Cir.1982). The court finds that the stipulation goes to a question of law.

■ Plaintiffs contend that allowing the waiver to be withdrawn is prejudicial to the plaintiffs in that defendants, by entering into that stipulation, had already agreed that they were required to pay plaintiffs overtime and that the only issue should be coverage under section 7(k) of the Act. 29 U.S.C. § 207(k). In their answer, defendants specifically pled as a second defense, "Plaintiff's claims are barred in whole or in part by exemptions, exclusions and credits provided in sections 7 and 13 of the Fair Labor Standards Act, as amended ("FLSA"), i.e., 29 U.S.C. §§ 207 and 213." Defendants' contention is not a new bolt from the blue, rather they had maintained a defense of the 13(b)(1) exemption from the outset. Both parties ably addressed the 13(b)(1) issue both at the non-jury trial and in post-trial briefs. The court finds that any possible prejudice to the plaintiffs is outweighed by the need to have the issues that turn on questions of law before the court. Accordingly, the court hereby

---

**2.** He receives an extra $25 per pay period as shift captain; plaintiff Ray Mercer also received an extra $25 in base pay per pay period as shift captain.

**3.** The court heard evidence as whether or not defendants are covered by section 213(b).

GRANTS defendants' motion to withdraw their stipulation.

### III. The Applicability of the Section 13(b)(1) Exemption

Section 13 of the FLSA regarding exemptions provides that:

> (b) The provisions of section 207 of this title shall not apply with respect to—
>
> (1) any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 304 of Title 49; ....

29 U.S.C. § 213(b)(1).[4] Defendants argue that the Secretary of Transportation (formerly the Interstate Commerce Commission (ICC)) has the power to establish maximum hours of service and application of this section completely exempts the plaintiffs from coverage under the FLSA because it provides for coverage under the Motor Carriers Act (MCA).

■ There is no concurrent jurisdiction between the two acts. *Morris v. McComb,* 332 U.S. 422, 437, 68 S.Ct. 131, 138, 92 L.Ed. 44 (1947). The Department of Labor has the power to regulate with regard to the FLSA and the Department of Transportation has the power to regulate with regard to the MCA. The Secretary of Transportation need not actually exercise "the power to establish qualifications and maximum hours of service," as long as that power to regulate exists. *Morris,* 332 U.S. at 435, 68 S.Ct. at 139 (5–4 decision); *but see* dissenting opinions, 332 U.S. at 438, 68 S.Ct. at 137. The question is whether the Secretary of Transportation has the power to regulate ambulance services.

■ It is well-recognized that ambulance service, and in particular, the Ben Hill County EMS, is part of the transportation industry. Uncontroverted evidence shows that the largest single category of calls the Ben Hill EMS receives is for patient transfers from one treatment facility to another. The EMS transports patients from Fitzgerald to other hospitals in places such as Atlanta, Macon and Tifton. The EMS uses the interstate highways for most out-of-town transfers. In addition, the EMS is occasionally called on to transport patients across state lines. Plaintiffs Spires and Sanders both testified that they had made trips to Florida transporting patients.

Both parties agree that the plaintiffs are involved in interstate commerce, however they disagree as to whether EMTs are covered by the FLSA or the MCA. A review of the case law reveals that only two circuits have examined the applicability of the MCA and the FLSA to ambulance services, and they reached conflicting conclusions. The Sixth Circuit, in *Benson v. Universal Ambulance Service, Inc.,* 675 F.2d 783 (6th Cir.1982), found that ambulance drivers who operate in interstate commerce are exempt from the regulatory power of the Department of Labor under section 13(b)(1) of the FLSA. In 1984, the Ninth Circuit disagreed with the Sixth Circuit's reasoning in *Benson* and held that the FLSA rather than the MCA applies to ambulance services. *Jones v. Giles,* 741 F.2d 245 (9th Cir.1984). After careful consideration, this court is persuaded that the Ninth Circuit's reasoning is the more appropriate analysis and finds that the exemption provided by section 213(b)(1) does not apply to ambulance services.

The Sixth Circuit reasoned that "The structure of the Motor Carriers Act itself bolsters the conclusion that non-typical forms of transportation such as this [ambulance service—the business of transporting passengers for hire from one place to another] were intended to be included within the definition of 'carrier' in that specific exemptions were provided for such similarly specialized forms of transportation as taxicabs and schoolbuses." *Benson,* 675 at 786. Because ambulances were not specifically exempt from the MCA, the Sixth Circuit concluded they must be subject to the Act.

The Ninth Circuit differed in its interpretation of the meaning of the specific exemptions in the MCA:

---

**4.** 49 U.S.C. § 304 has been re-enacted at 49 U.S.C. § 3102.

We do not believe, however, that the list of specific exemptions contained in § 303(b)(1) & (2) was intended to be exclusive. Rather, the list of exclusions appears to have been intended to clarify the types of transportation to which the Motor Carriers Act was not intended to apply. Ambulance services, like taxicabs, transport small numbers of people and do not use predetermined routes. In addition, ambulances and taxicabs, unlike interstate trucking firms, are usually subject to municipal regulation. Ambulances, like taxicabs, are therefore not the sorts of transportation that require national regulation.

*Giles,* 741 F.2d at 249–50. This court agrees that ambulances are more analogous to taxicabs than to trucks. A 1966 opinion letter of the Wage and Hour Administrator supports the conclusion that ambulance services, like taxicabs, should be regulated by the Department of Labor.[5]

A former Fifth Circuit opinion, which is binding upon this court, convinces the court that the Ninth Circuit's analysis results in the correct interpretation of the exemptions. In *Marshall v. Victoria Transportation Co., Inc.,* 603 F.2d 1122 (5th Cir. 1979), the former Fifth Circuit held that city bus operators' employees were covered by the FLSA. In *Marshall,* the buses were not schoolbuses, which are specifically exempt from coverage under the MCA, but were passenger buses that transported persons making international journeys.

Nevertheless, the former Fifth Circuit found that the employees were within the coverage of the FLSA.[6]

This court believes that even though ambulance services are not listed as specifically exempt from the coverage of the MCA, this does not mean that ambulance services are subject to the MCA. A review of the legislative history of the MCA supports the conclusion that ambulance services are covered by the FLSA.

In 1966 Congress passed the Department of Transportation Act (hereinafter DOTA), Pub.L. No. 89–670, 80 Stat. 931 (1966) (codified at 49 U.S.C. §§ 1651–1659 (1976)), which provided that "all functions, powers, and duties of the Interstate Commerce Commission" with regard to the hours and safety provisions of the MCA [Motor Carriers Act] would be transferred from the ICC to the DOT. The Act became effective on April 1, 1967....

Section 12 of the DOTA specifically provided that "all orders, declarations, rules, regulations, permits, contracts, certificates, licenses, and privileges" which were in effect before the transfer of functions to the DOT and which related to those functions would continue in force until set aside by the DOT or terminated by operation of law or by order of court. 80 Stat. 949.

*Newhouse v. Roberts Ilima Tours, Inc.,* 523 F.Supp. 320, 321–22 (D.Ha.1981), *aff'd in part and rev'd in part,* 708 F.2d 436

---

5. [¶ 30,997.01] Opinion Letter of the Wage–Hour Administrator.
Opinion Letter No. 462. May 23, 1966.
Employees engaged in responding to emergency calls for ambulance service to pick up dead or injured victims of motor vehicle accidents on public streets and highways are engaged in interstate commerce within the coverage of the Act [the FLSA]. The necessary treatment and removal of such persons before the highway can be cleared of stopped and disabled vehicles to permit resumption of the normal flow of traffic is so closely related to the flow of commerce and the functioning of its instrumentalities as to be a part of commerce (see sections 776.8–776.9 of the Interpretative Bulletin on general coverage of the Act).
... *[T]the typical ambulance service establishment, engaged exclusively or nearly so in pro-*viding a specialized form of transportation for sick, injured, aged or handicapped persons, is a part or branch of the transportation industry, closely analogous to taxicab or airport limousine services. Since there is no traditional retail concept in the transportation industry the section 13(a)(2) exemption cannot apply to such ambulance service establishments (see section 779.316 of the Interpretative Bulletin on retailers of goods or services). (Emphasis added). The court believes that the analysis for privately operated ambulance services holds true for ambulance services operated by a public agency.

6. Although the question of coverage under the MCA did not arise, since the court found that the employees were covered by the FLSA, they could not be covered by the MCA.

(9th Cir.1983). "The Secretary of Transportation, by virtue of the transfer of authority from the ICC of all orders previously issued by the ICC to the Secretary of Transportation [provided for by section 12 of the DOTA], thus adopted the *Lonnie W. Dennis* decision." *Giles*, 741 F.2d at 249. The Ninth Circuit explained the significance of *Lonnie W. Dennis* as it relates to the applicability of the MCA to ambulance services.

> The Interstate Commerce Commission concluded in *Lonnie W. Dennis*, 63 M.C.C. 66 (1954), that the petitioner's ambulance services were outside the jurisdiction of the Motor Carriers Act.... Once a certificate of exemption is in existence, the carrier is removed from MCA jurisdiction until the certificate is revoked or conditioned.... In this case, the Secretary of Transportation has incorporated the *Dennis* decision in its interpretation of the [Federal Motor Carrier Safety Regulations] FMCSR, therefore it is the FLSA, and not the MCA, that applies to appellees' [the ambulance drivers and paramedics] overtime claims.

*Id.* The court believes this logic is applicable to the case at bar.

The court finds that ambulance services and emergency medical services are not subject to the Motor Carriers Act, and are therefore subject to the FLSA.[7] Therefore, the court holds that the section 13(b)(1) exemption of the FLSA is not applicable to ambulance services and that the parties are subject to the provisions of the FLSA.

## IV. The Applicability of the Fair Labor Standards Act

The FLSA provides guidance for determining the maximum hours of employees covered by the Act and provides overtime protection to employees who are required to work long hours.[8] The FLSA generally requires that employees engaged in interstate commerce must receive compensation at one and one-half times the regular rate for a workweek longer than forty hours.[9] The Supreme Court has made clear that courts should interpret coverage under the FLSA liberally, "to apply to the furthest reaches consistent with congressional direction," while they should construe exemptions from coverage very narrowly. *Tony & Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290, 296, 105 S.Ct. 1953, 1959, 85 L.Ed.2d 278 (1985); *Powell v. United States Cartridge Co.*, 339 U.S. 497, 516–17, 70 S.Ct. 755, 765–66, 94 L.Ed. 1017 (1950).

### A. The Applicability of the Section 7(k) Exemption for Employees Engaged in Fire Protection or Law Enforcement Activities to the Ben Hill EMTs.

Defendants argue that Ben Hill County is entitled to an exemption to the general requirement of paying overtime to employees for any hours worked over forty in a workweek with regard to the EMTs because Ben Hill EMTs are engaged in fire protection or law enforcement activities. Section 7(k) of the FLSA partially exempts employees engaged in these activities from the requirements of section 7(a). 29 U.S.C.

---

7. The court is also guided by the commitment in this Circuit to giving the FLSA a broad, liberal construction. *Marshall*, 603 F.2d at 1123; *Brennan v. Wilson Building, Inc.*, 478 F.2d 1090 (5th Cir.), *cert. denied*, 414 U.S. 855, 94 S.Ct. 156, 38 L.Ed.2d 105 (1973).

8. The FLSA is the Federal law of most general application concerning wages and hours of work. It requires that all covered and nonexempt employees be paid not less than the minimum wage of $3.35 an hour and not less than one and one-half times their regular rates of pay for all hours worked over 40 in a workweek. Department of Labor Administrative Letter Ruling of October 9, 1987, Fair Labor Standards Handbook, App. III at 173, 174, Thom. Pub.

Group, Inc. (March 1988) (hereinafter "DOL October 9, 1987 Letter Ruling"); Opinion Letter of Wage–Hour Administrator, Opinion Letter No. 1598. Oct. 23, 1985.

9. 29 U.S.C. § 207(a)(1) provides:

Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

§ 207(k).[10] The partial overtime pay exemption provided for by section 7(k) reads as follows:

(k) Employment by public agency engaged in fire protection or law enforcement activities

No public agency shall be deemed to have violated subsection (a) of this section with respect to the employment of any employee in fire protection activities or any employee in law enforcement activities (including security personnel in correctional institutions) if—

(1) in a work period of 28 consecutive days the employee receives for tours of duty which in the aggregate exceed the lesser of (A) 216 hours, or (B) the average number of hours (as determined by the Secretary pursuant to section 6(c)(3) of the Fair Labor Standards Amendments of 1974) in tours of duty of employees engaged in such activities in work periods of 28 consecutive days in calendar year 1975; or

(2) in the case of such an employee to whom a work period of at least 7 but less than 28 days applies, in his work period the employee receives for tours of duty which in the aggregate exceed a number of hours which bears the same ratio to the number of consecutive days in his work period as 216 hours (or if lower, the number of hours referred to in clause (B) of paragraph (1)) bears to 28 days,

compensation at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(k). If the Ben Hill EMTs fall into the category of either law enforcement or fire protection employees, they will not be entitled to as much overtime compensation as if they were covered by section 207(a)(1).[11] Defendants contend that the Ben Hill EMTs are covered by the exemption governing fire protection personnel.

The Department of Labor (DOL) has promulgated regulations to carry out the purposes of the FLSA, including section 7(k). These regulations are published in 29 CFR Part 553—Application of the Fair Labor Standards Act to Employees of State and Local Governments. The DOL has defined the terms of law enforcement and fire protection personnel in 29 CFR sections 553.210 and 553.211.[12] The Ben Hill EMTs, as rescue and ambulance service

**10.** In 1985 Congress amended the FLSA to provide that a public agency shall be liable under the FLSA for acts occurring on or after April 15, 1986. Section 2(c)(1) of the 1985 Amendments. The Fair Labor Standards Amendments of 1985 amended the FLSA after the Supreme Court decision in *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). Pub.L. 99–150, § 7, November 14, 1985, 99 Stat. 791. "The 1985 Amendments ... changed certain provisions of the Act as they apply to employees of State and local public agencies...." 29 CFR § 553.2(a). Congress added section 7(k) as one of the 1985 Amendments. The 1985 Amendments also provided that they be published in section 775.3 of title 29 of the Code of Federal Regulations (CFR).

**11.** Under section 207(a)(1), an employee works 160 hours per 28 day period (or 40 hours in a workweek) before the employer must pay overtime. A law enforcement employee works 171 hours per 28 day period (or 42 and ¾ hours in a workweek) and a fire protection employee works 212 hours per 28 day period (or 53 hours in a workweek) before the public agency must pay overtime. 29 CFR § 553.230.

**12.** § 553.210 Fire protection activities.

(a) As used in sections 7(k) and 13(b)(20) of the Act, the term "any employee ... in fire protection activities" refers to any employee (1) who is employed by an organized fire department or fire protection district; (2) who has been trained to the extent required by State statute or local ordinance; (3) who has the legal authority and responsibility to engage in the prevention, control or extinguishment of a fire of any type; and (4) who performs activities which are required for, and directly concerned with, the prevention, control or extinguishment of fires, including such incidental non-firefighting functions as housekeeping, equipment maintenance, lecturing, attending community fire drills and inspecting homes and schools for fire hazards.... *The term would also include rescue and ambulance service personnel if such personnel form an integral part of the public agency's fire protection activities. See § 553.215.*

29 CFR § 553.210(a) (emphasis added).

§ 553.211 Law enforcement activities.

(a) As used in sections 7(k) and 13(b)(20) of the Act, the term "any employee ... in law enforcement activities" refers to any employee (1) who is a uniformed or plainclothed member of a body of officers and subordinates who are empowered by State statute

personnel, could be employees in law enforcement or fire protection activities if the Ben Hill EMS forms an integral part of Ben Hill County's law enforcement or fire protection activities.

■ The court finds that plaintiff Spires was not engaged in either law enforcement activities or fire protection activities for the period when he was a dispatcher for the EMS. Sections 553.210(c) and 553.211(g) specifically state that "so-called 'civilian' employees ... who engage in such support activities as those performed by dispatcher, radio operators ..." are not included in the terms defining employees engaged in law enforcement or fire protection activities. The Wage and Hour Administrator has also declared that dispatchers would not qualify for the partial overtime pay exemption provided for in section 7(k).[13] The court holds that an employee of the Ben Hill EMS who engages in such support activities is not exempt under section 7(k).

The DOL regulations (29 CFR § 553.210(a) and 29 CFR § 553.211(b)) refer to a regulation dealing specifically with ambulance and rescue service employees— section 553.215. According to the standard set out in section 553.215, if the Ben Hill EMTs' "services are substantially related to firefighting or law enforcement activities," then the section 7(k) exemption may be applicable.[14]

*B. The 29 CFR Section 553.215(a) Test for Exempting Ambulance and Rescue Service Employees.*

The applicable test for exempting ambulance and rescue service personnel under

section 7(k) is set out in 29 CFR section 553.215(a).

§ 553.215 Ambulance and rescue service employees.

(a) Ambulance and rescue service employees of a public agency other than a fire protection or law enforcement agency may be treated as employees engaged in fire protection or law enforcement activities of the type contemplated by sections 7(k) and 13(b)(20) if their services are substantially related to firefighting or law enforcement activities in that (1) the ambulance and rescue service employees have received training in the rescue of fire, crime, and accident victims or firefighters or law enforcement personnel injured in the performance of their respective, [sic] duties, and (2) the ambulance and rescue service employees are regularly dispatched to fires, crime scenes, riots, natural disasters and accidents. As provided in § 553.213(b), where employees perform both fire protection and law enforcement activities, the applicable standard is the one which applies to the activity in which the employee spends the majority of work time during the work period.

29 CFR § 553.215(a). As employees of the Ben Hill County EMS, a public agency other than a fire protection or law enforcement agency, the EMTs must pass the test outlined in 29 CFR section 553.215(a) to be exempt under section 7(k). The parties disagree as to whether or not defendants have

---

or local ordinance to enforce laws designed to maintain public peace and order and to protect both life and property from accidental or willful injury, and to prevent and detect crimes, (2) who has the power to arrest, and (3) who is presently undergoing or has undergone or will undergo on-the-job training and/or a course of instruction and study which typically includes physical training, self-defense, firearm proficiency, criminal and civil law principles, investigative and law enforcement techniques, community relations, medical aid and ethics.

(b) ... *The term would also include rescue and ambulance service personnel if such personnel form an integral part of the public agency's law enforcement activities. See § 553.215.*

29 CFR § 553.211(a) and (b) (emphasis added).

13. Paramedics, or other EMS personnel who ride in the ambulance, may qualify for the *partial overtime pay exemption if the tests* discussed above are met. However, employees such as dispatchers, repair and maintenance workers, or clerks would not qualify for the exemption.
[¶ 31,931] Opinion Letter of the Wage–Hour Administrator. Opinion Letter No. 1597. Oct. 17, 1985.

14. The parties do not dispute the fact that EMTs may be classified as employees engaged in fire protection and law enforcement activities.

met the two-pronged test set forth in the regulation.

Plaintiffs contend that neither prong is met with respect to fire protection and that only the first prong is met with respect to law enforcement. (Plaintiffs concede that they have received training in the rescue of accident victims. The EMTs are trained in equipment to extricate persons using the "jaws of life.") Plaintiffs claim that Ben Hill EMTs have not received training in the rescue of fire or crime victims or firefighters or law enforcement personnel injured in the performance of their respective duties[15]; nor are EMTs *regularly* dispatched to fires, crime scenes, riots, natural disasters and accidents. Defendants claim that they have met their burden of proof in showing that the Ben Hill EMTs are employees engaged in fire protection activities.

Before examining this issue, the court will analyze the impact of the twenty percent limitation on nonexempt work (the 80/20 rule) on defendants' claim of exemption.

*C. The Applicability of the 80/20 Rule.*

■ The DOL has publicized section 553.212 as part of its regulations regarding exemptions from coverage under section 7(a) of the FLSA.

§ 553.212 Twenty percent limitation on nonexempt work.

(a) Employees engaged in fire protection or law enforcement activities as described in §§ 553.210 and 553.211, may also engage in some nonexempt work which is not performed as an incident to or in conjunction with their fire protection or law enforcement activities. For example, firefighters who work for forest conservation agencies may, during slack times, plant trees and perform other conservation activities unrelated to their firefighting duties. The performance of such nonexempt work will not defeat either the section 13(b)(20) or 7(k) exemptions unless it exceeds 20 percent of the total hours worked by that employee during the workweek or applicable work period. A person who spends more than 20 percent of his/her working time in nonexempt activities is not considered to be an employee engaged in fire protection or law enforcement activities for purposes of this part.

29 CFR § 553.212(a). Defendants contend that this section applies only to firefighters and law enforcement personnel, and not to ambulance and rescue service personnel. The court differs with the defendants in its analysis of the application of section 553.-212.

Contrary to defendants' position, the structure of the regulations indicates that section 553.212 applies to ambulance and rescue service personnel as well as firefighters and law enforcement personnel. Section 553.212 is in the middle of the section entitled "Exemption Requirements" which includes sections 553.210 through 553.216, under Subpart C—Fire Protection and Law Enforcement Employees of Public Agencies. In addition, sections 553.210 and 553.211, dealing primarily with employees engaged in fire protection or law enforcement activities, to which section 553.212 applies on its face, explicitly incorporate section 553.215 and ambulance service personnel. Defendants overlook the fact that 29 CFR § 553.213, covering public safety officers who are engaged in both fire protection and law enforcement activities,[16] re-

---

**15.** Plaintiffs Spires and Sanders testified in reference to activities involving fire protection that it is the policy of the Ben Hill EMS that EMTs not go into a dangerous situation or be involved in any situation the EMT deems too dangerous for his training. Testimony of David Alan Sanders and Fred Spires, Transcript, Volume II, pp. 88–89, 121–122.

**16.** That section provides as follows:
§ 553.213 Public agency employees engaged in both fire protection and law enforcement activities.

(a) Some public agencies have employees (often called "public safety officers") who engage in other fire protection and law enforcement activities, depending on the agency needs at the time. This dual assignment would not defeat either the section 13(b)(20) or 7(k) exemption, provided that each of the activities performed meets the appropriate tests set forth in §§ 553.210 and 553.211. This is so regardless of how the employee's time is divided between the two activities. However, *all time spent in nonexempt activities by public*

quires that the nonexempt activities be combined for the purposes of nonexempt work discussed in section 553.212. Although section 553.212 does not specify that it is applicable to public safety officers, it is; likewise, even though section 553.212 does not specify it is applicable to ambulance and rescue service personnel, the interrelatedness of the sections implies that section 553.215 applies to those public agency employees as well.

The section 553.215 provision, which provides that ambulance and rescue service personnel may be covered by section 207(k) if their services are substantially related to either fire protection or law enforcement activities, makes sense in the context of the 80/20 rule. If the EMTs spend greater than 20% of their services on nonexempt activities, or activities that are not related to either fire protection or law enforcement activities, then it logically follows that defendants should not be entitled to an exemption with regard to EMTs that is not available with regard to an employee actually engaged in fire protection or law enforcement activities. The court finds that the twenty percent limitation on nonexempt work, one of the exemption requirements set forth in the DOL regulations, applies to any ambulance and rescue service personnel who may be treated as an employee engaged in fire protection or law enforcement activities of the type contemplated by section 7(k).

■ If the Ben Hill EMTs spend more than twenty percent of their working time

in nonexempt activities, they are not covered by section 7(k), even should the court find them to be employees engaged in fire protection or law enforcement activities. *See Horan v. King County, Wash.,* 740 F.Supp. 1471, 1481 (W.D.Wash.1990). Defendants claim that, adding in support time and all calls related to fire enforcement or law protection, at least eighty percent of the plaintiffs' time would be exempt. The court finds that the evidence presented in this case does not support that contention.

Defendants themselves argued that the majority of the plaintiffs' calls are for patient transfers. Defendants' Post Trial Brief, p. 6. Patient transportation is neither a law enforcement activity nor a fire protection activity. Yet the EMTs "run these transports fairly frequently, as often as two or three per shift." Defendants' Post Trial Brief, p. 6; *see also* Letter from Robert W. Chasteen, Jr. (attorney for Ben Hill County) to J.E. Brown (at DOL's Wage and Hour Division) (August 25, 1988) (concerning Ben Hill County Emergency Medical Service) ("It appears that the EMTs regularly transport sick or injured persons in interstate commerce and are subject to doing so at any time.") Don Lindsey, paramedic and director of Ben Hill County EMS, also testified that in terms of time-consuming activity, patient transfers is the biggest single item as far as the EMTs' activity is concerned, and the next largest time-consuming activity is maintenance, maintaining the units, changing the linens, etc.[17] Testimony of Don Lindsey, Tran-

*safety officers within the work period, whether performed in connection with fire protection or law enforcement functions, or with neither, must be combined for purposes of the 20 percent limitation on nonexempt work discussed in § 553.212.*
(b) As specified in § 553.230, the maximum hours standards under section 7(k) are different for employees engaged in fire protection and for employees engaged in law enforcement. For those employees who perform both fire protection and law enforcement activities, the applicable standard is the one which applies to the activity in which the employee spends the majority of work time during the work period.
29 CFR § 553.213 (emphasis added).

**17.** There was no evidence that the time spent on maintenance was an activity supporting the fire

protection or law enforcement activities. Presumably, a corresponding amount of time would be spent maintaining the vehicles in support of that activity as time spent on the activity itself. For example, if the EMT spent 10% of his or her working time in fire protection activities, then of the working time spent on maintenance, 10% would be in doing maintenance in support of the fire protection activities. If an EMT spent 20% of his or her working time on patient transport, then approximately 20% of the working time spent on maintenance would be in support of the patient transfers. The court realizes that the corresponding number is approximate because the time spent actually doing the maintenance work or reading or watching television is not factored into the general time. This means that it might not be a straight 1:1 ratio, but it should still correspond

script, Volume II, pp. 216–217. Lindsey also testified that another large block of time is spent reading, studying and watching television. Testimony of Don Lindsey, Transcript, Volume II, p. 218.

The Chasteen letter also includes a list showing the number of accident calls and the total calls received by the EMS from June 1987 through June 1988. Plaintiffs' Exhibit 11, tendered by the defendants. According to this list, out of a total number of 1683 calls for this thirteen month period, 237 were accident calls, or approximately 14 percent. It appears that the number of responses to "fire calls" (excluding accidents) is less than the number of responses to accidents.

Plaintiffs presented evidence based on the radio logs of the Fitzgerald Fire Department, the Fitzgerald Police Department and the Ben Hill County Sheriff's Department, and the Ben Hill County EMS for three random months: October 1987, January 1988, and August 1989. Plaintiffs' exhibits, P–16 through P–30. In October 1987, the EMS report reveals that the percentage units dispatched to accidents and fires was 12%; the percentage of units dispatched to all other calls was 88%.[18] In January 1988, the percentage units dis-

patched to all other calls beside accidents and fires was 76%.[19] The percentage units dispatched to all other calls in August 1989 was 86%. This data appears to show overwhelmingly that defendants spent more than twenty percent of their time in nonexempt activities, even allowing for statistical error and variances and support time in relation to any accident or fire calls or associated activity.[20]

The court finds that the Ben Hill EMTs were not involved in law enforcement or fire protection activities or other related supporting activities for 80 percent of their working time. Because the court has found that the Ben Hill EMTs spend more than 20 percent of their working time in nonexempt activity, the court also finds that the plaintiffs are not to be considered or treated as employees engaged in fire protection or law enforcement activities of the type contemplated by section 7(k). Therefore, the court finds that the section 7(k) exemption to the FLSA forty hour workweek provisions is not applicable to the Ben Hill EMTs.[21] Accordingly, the court directs Ben Hill County to pay overtime to the EMTs for all hours worked in excess of forty hours per week.

according to the hours spent in the main activity.

18. The list prepared by defendants included in the Chasteen letter indicates that there were 13 strictly accident calls out of 141 total calls. This appears to be the lowest ratio for the 13 month period.

19. The list submitted to the DOL Wage and Hour Division by Chasteen shows that 21 calls out of 132 total calls were strictly accident calls. This is approximately 15.9% of the calls. The data submitted by plaintiffs of responses to accident and fire calls (added together), based on the percentage of units dispatched (and thus the number of EMTs involved) as opposed to the number of calls, is higher—19%—actually favoring the defendants' position.

The October 1987 data of the parties discloses a similar event. According to the list prepared by defendants, the percentage of strictly accident calls that the EMS responded to was 9.5% of the total calls. Plaintiffs' data indicates that 12% of the units were dispatched to accidents.

The defendants attempted to discredit plaintiffs' data on the basis that the logs from the Ben Hill County Sheriff's Department, the Fitz-

gerald Fire Department and the Fitzgerald Police Department combined might not reflect all the calls to which the EMS responded. The court believes that the data plaintiffs presented is worthy of consideration, especially in light of the fact that it is more favorable to the defendants than the data prepared by the defendants.

20. The Ben Hill County EMS also responds to calls that would not fit into either category. The EMTs respond to cardiac calls, diabetic calls, injuries and other medical emergencies.

21. Although the court will forgo making a determination as to whether the defendants were able to establish that plaintiffs met the two-pronged test of 29 CFR § 553.215, the court will note that, from the evidence regarding the application of the 80/20 rule, the EMS does not appear to be an integral part of Ben Hill's law enforcement or fire protection activities. Nor do the EMS' services appear to be substantially related to law enforcement or firefighting activities. The court also observes that there was evidence presented that typically the EMS did not get at least one fire call per week. Testimony of David Alan Sanders, Transcript, Volume II, p. 83.

## V. Compensability for "On-Call" Days

■ Plaintiffs claim that they are entitled to minimum wage and overtime compensation for the hours spent on-call, exclusive of the hours actually spent working. Defendants contend that plaintiffs' on-call shifts are not compensable except for the hours during which they were actually called in to work. The DOL has addressed the question of compensable hours of work at 29 CFR § 553.221.

> An employee who is not required to remain on the employer's premises but is merely required to leave word at home or with company officials where he or she may be reached is not working while on call. Time spent at home on call may or may not be compensable depending on whether the restrictions placed on the employee preclude using the time for personal pursuits. Where, for example, a firefighter has returned home after the shift, with the understanding that he or she is expected to return to work in the event of an emergency in the night, such time spent at home is normally not compensable. On the other hand, where the conditions placed on the employee's activities are so restrictive that the employee cannot use the time effectively for personal pursuits, such time spent on call is compensable.

29 CFR § 553.221(d). The question is whether the conditions placed on the EMT's activities are so restrictive that the EMT cannot use the time effectively for personal pursuits. If the conditions are so restrictive, then the time an EMT spent on call is compensable.

While on-call, Ben Hill County EMS requires its employees to be able to respond to calls at the EMS station within ten minutes of receiving a call in a uniform or jumpsuit, clean and sober. Plaintiffs submitted documents with their post-trial brief demonstrating that some of the plaintiffs worked a substantial number of hours while on-call.[22] The plaintiffs argue that the court should also consider the amount of hours the EMTs work while on-call as an implicit restriction on the EMTs' freedom.

Plaintiff Sanders lives approximately two miles from the EMS station within the City of Fitzgerald. Sanders testified that the requirement of having to respond within ten minutes of being notified keeps him from being able to live in most parts of Ben Hill County, or from travelling substantially beyond the city limits of Fitzgerald. Sanders has a belt radio and a radio in his truck that can be used to notify him and call him in to work. He testified that he used to run a photography business on his on-call days. He operated his business full-time and then part-time, and then as a hobby until his camera was stolen. Sanders also stated that he was able to read, watch television, work in the yard as long as he did not get too dirty, go shopping, fishing, bowling or to the movies while on-call. Spires and Ray Mercer both testified that they lived within five minutes of the EMS station. Ray Mercer also indicated that he had a business on the side repairing radios at which he would work during his on-call days when possible.

Although the evidence is mixed on this question, after considering all of the evidence presented, the court finds that the conditions placed on the EMTs while on-call were not so restrictive so as to preclude them from effectively using the time for personal pursuits. Both Sanders and Ray Mercer have operated businesses at some point, and both men have been able to pursue hobbies (this even though plaintiffs submitted data indicating that each man worked greater than eight hours per 24 on-call period). Given the job EMTs do, the court does not believe the conditions are unreasonable or unexpected, nor do they unduly restrict the EMTs. Accordingly, the court finds that only the hours spent working while on-call are compensable.

## VI. The Applicability of the "Fluctuating Workweek" Formula

■ Defendants claim that the "fluctuating workweek" formula applies, thus the

---

**22.** Plaintiffs Sanders and Ray Mercer each averaged working more than eight hours per on-call day. Plaintiff Suzy Mercer averaged approximately 3.4 hours per on-call day; and plaintiff Spires averaged working in excess of nine hours per on-call day. Plaintiffs' exhibits 43, 44, 45 and 46 attached to plaintiffs' post-trial brief (not admitted at trial).

plaintiffs are entitled only to an additional half-time for overtime hours, rather than one and one-half time for overtime hours. Defendants further claim that they have paid all the overtime that plaintiffs are due. In effect, defendants maintain that they overpaid the plaintiffs. The DOL regulation set out at 29 CFR § 778.114 deals with employees to whom the fluctuating workweek formula might apply.[23]   § 778.114 Fixed salary for fluctuating hours.

(a) An employee employed on a salary basis may have hours of work which fluctuate from week to week and *the salary may be paid him pursuant to an understanding with his employer* that he will receive such fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many. *Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek,* whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act if the amount of the salary is sufficient to provide compensation to the employee at a rate not less then the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest, and if he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay. Since the salary in such a situation is intended to compensate the employee at straight time rates for whatever hours are worked in the workweek, the regular rate of the employee will vary from week to week and is determined by dividing the number of hours worked in the workweek into the amount of the salary to obtain the applicable hourly rate for the week. Payment for overtime hours at one-half such rate in addition to the salary satisfies the overtime pay requirement because such

hours have already been compensated at the straight time regular rate, under the salary arrangement.

.     .     .     .     .

(c) The "fluctuating workweek" method of overtime payment may not be used unless the salary is sufficiently large to assure that no workweek will be worked in which the employee's average hourly earnings from the salary fall below the minimum hourly wage rate applicable under the Act, and *unless the employee clearly understands that the salary covers whatever hours the job may demand in a particular workweek and the employer pays the salary even though the workweek is one in which a full schedule of hours in not worked.* Typically, such salaries are paid to employees who do not customarily work a regular schedule of hours and *are in amounts agreed on by the parties as adequate straight-time compensation for long workweeks as well as short ones, under the circumstances of the employment as a whole....* On the other hand, where all the facts indicate that an employee is being paid for his overtime hours at a rate no greater than that which he receives for nonovertime hours, compliance with the Act cannot be rested on any application of the fluctuating workweek overtime formula.

29 CFR § 778.114 (emphasis added).

Ben Hill EMTs receive base pay for each two week period. The EMTs also receive on-call pay and call-in pay. During each two week period, the EMTs work set 24–hour shifts, although the number of shifts per pay period may change—an EMT may work 96 hours or 120 hours in regularly scheduled hours, also known as base hours. The EMT also works call-in hours which vary from shift to shift and pay period to pay period. Each EMT receives an annual salary that covers the base hours, but the base pay does not cover any of the call-in hours. Each EMT is paid straight time on an hourly basis for call-in hours worked.

**23.** Defendants argue that the DOL Compliance Officer used this theory in his computations    during his investigation.

The court does not believe that the fluctuating workweek formula applies to the Ben Hill EMTs. There has been no evidence presented that there was a mutual understanding that the salary covers whatever hours were worked, no matter how long or short. This may be true as to the base hours, for example, in their variances from 96 to 120 in a two week period, but not as to their call-in hours. It was always the practice in Ben Hill County that an EMT would receive a straight hourly wage for call-in hours, separate and distinct from the base salary. Apparently, defendants' theory is that the base salary included call-in hours, and the EMTs clearly understood that they would only be compensated at a half-time rate. Yet the facts belie this.

Defendants' own practice of paying EMTs a straight hourly rate (based on the hourly rate of pay for the base hours that particular period) for call-in pay shows a different understanding than the one now being claimed. The straight time pay for call-in hours is evidence that the base salary does not satisfy "the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement." 29 CFR § 778.114(a). In effect the EMTs were receiving straight time for all hours worked, whether base hours or on-call hours and this comprised the real salary of the EMTs.

The court finds the clear mutual understanding between the parties that is necessary for the application of the fluctuating workweek is absent. Furthermore, in this case "all the facts indicate that an employee is being paid for his overtime hours at a rate no greater than that which he receives for nonovertime hours, [thus] compliance with the Act cannot be rested on any application of the fluctuating workweek overtime formula." 29 CFR § 778.114(a). The plaintiffs are therefore entitled to one and one-half times the regular rate of compensation for all hours worked over forty in a workweek.

**24.** In this case, the statute of limitations cannot go back to any acts occurring before April 15,

## VII. Willfulness and the Statute of Limitations

Congress has enacted a two-tiered statute of limitations: plaintiffs must commence actions to enforce the FLSA within a two-year limitations period; however, if the plaintiffs succeed in establishing that an employer's violations of the Act were willful, the limitations period is extended to three years.[24]

In *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988), the Supreme Court adopted the same test to define a "willful" violation that it employed in *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 125–130, 105 S.Ct. 613, 623–626, 83 L.Ed.2d 523 (1985). For purposes of applying the three-year statute of limitations to a violation of the FLSA, an employer has committed a willful violation of the FLSA if it " 'knew or *showed reckless disregard for the matter of whether* its conduct was prohibited by the FLSA.' " *McLaughlin*, 486 U.S. at 130, 108 S.Ct. at 1680, (quoting *Brock v. Richland Shoe Co.*, 799 F.2d 80, 83 (3rd Cir.1986) (emphasis in original)). The burden is on the plaintiff to prove that the employer's conduct was willful. *McLaughlin*, 486 U.S. at 135, 108 S.Ct. at 1682. The Supreme Court explained: "If an employer acts reasonably in determining its legal obligation, its action cannot be deemed willful ... under the standard we set forth. If an employer acts unreasonably, but not recklessly, in determining its legal obligation, then, its action ... should not be" considered willful. *McLaughlin*, 486 U.S. at 135 n. 13, 108 S.Ct. at 1682 n. 13.

Defendants contend that all of the County's actions indicate a willingness to comply with the Act. William Edwin Drexler, a County Commissioner during this period, testified that James Lee, the County Administrator, informed the County Commissioners that the County had to govern under the Fair Labor statutes. Testimony of William Edwin Drexler, Transcript, Volume I, p. 67. The Commissioners testified that in 1986 they were aware that the FLSA

1986. Section 2(c)(1) of the 1985 Amendments to the Fair Labor Standards Act.

applied to certain county employees. The Commissioners did not know the specifics of any situation regarding overtime hours because they turned that policy over to the County Administrator, Lee, and the County Attorney, Robert W. Chasteen.

In September of 1987, plaintiffs' former counsel wrote Lee two letters notifying the County that the plaintiffs' claimed there was a problem with overtime compensation. Prior to this time, Lee had computed the compensation of County employees according to his best judgment of what the law required. Testimony of James Lee, Transcript, Volume III, p. 35. Lee contacted Chasteen, the attorney for Ben Hill County, to make him aware of the problem. Chasteen approached a lawyer with experience in this field for assistance. The counsel whose advice Chasteen had sought recommended that the County pay time and a half for any hours worked over 212 in a twenty-eight day period. Chasteen and James followed his advice and in January 1988[25] the County started paying the EMTs as if they were subject to the FLSA, but exempt under the section 7(k) fire protection employees provision. Chasteen testified that he himself "really didn't know what exemptions they [the EMTs] might be entitled to," he just followed the advice he received. Testimony of Robert W. Chasteen, Transcript, Volume III, pp. 6, 83–87.

The DOL's Wage and Hour Division initiated an investigation shortly after the plaintiffs' former counsel wrote the letters to the County. Joseph Brown, a Compliance Officer with the Wage and Hour Division of the DOL, investigated Ben Hill County with respect to overtime compensation to EMTs. The DOL investigation began around November or December of 1987 and concluded in 1988.

On April 20, 1988, Brown had a final conference with Lee and Chasteen to review the findings of the Wage and Hour Division's investigation of the EMS. Brown told them that he found the County had violated section 7(a) on overtime compensation for its EMTs, and that he was concerned about future violations. He showed them his analysis that revealed that the EMS made only two fire calls out of a total of 1120 in 1986, four fire calls out of 1741 in 1987, and thirteen out of 349 in the first quarter of 1989. Brown concluded that the EMTs did not meet the 7(k) exemption requirements.[26]

On April 25, 1988, Lee contacted Brown and told him that the County had retained the lawyer referred to above who has experience in matters involving the FLSA.[27] Brown and Lee agreed to set up another meeting with the County's additional retained counsel, and Brown's superior, Milton Halbert, who is the District Director for the DOL. Halbert, Brown, Lee and the County's two attorneys, including Chasteen, met on May 9, 1988.

At that meeting, the County's second retained attorney disagreed with Brown's findings, and stated that he believed the EMTs would be exempt from the forty hour maximum hour workweek as employees engaged in fire protection activities. He also asked for additional time to conduct his own investigation before holding another meeting.

The men met again on July 1, 1988. At this conference, the County brought up its belief that the 13(b)(1) exemption discussed above should apply to the EMTs. It also restated its position that the 7(k) exemption should apply. The County further declared that the EMS would also respond to all fire calls made to the fire department and keep records to show the numbers of fire and

---

**25.** The pay period began December 3, 1987.

**26.** Defendants quarrel with how Brown computed the number of fire calls, arguing that some accident calls should be included. The court is not utilizing Brown's figures for the truth of the data, but rather as an indication of what the County was informed of so as to evaluate the County's knowledge or recklessness regarding its alleged FLSA violations. (The court recog-

nizes that some accidents could fall into the category of fire protection, but strongly believes that instead of a blanket definition, the origination of the calls should be used to determine whether they are related to law enforcement or fire protection.)

**27.** This attorney has not been an attorney of record at any time during this lawsuit.

accident responses. The County would pay overtime for any hours worked in excess of 212 in a twenty-eight day period if the records showed a much higher incident of accident and rescue responses. The County refused to pay any back wages the DOL had determined were due. The parties failed to reach a final resolution of the problem.

On August 25, 1988, Chasteen sent a letter to the Wage and Hour Division furnishing information as to why the County felt it was entitled to the 7(k) exemption and the 13(b)(1) exemption. Chasteen advised the County, from information furnished to him by the second attorney and the information he himself could obtain, that the County was entitled to the fire protection exemption provided for by section 7(k). Chasteen also based his advice on his interpretation of the meaning of rescue and how vehicular accidents should be categorized on opinion letters of the Wage and Hour Division Administrator. Testimony of Robert W. Chasteen, Transcript, Volume III, pp. 88–93. Chasteen did not examine how much time the EMTs spent at any particular group of activities, such as patient transfers or responding to accident calls to decide whether the 80/20 rule applied because he did not think it applied. Testimony of Robert W. Chasteen, Transcript, Volume III, p. 100.

Halbert, the District Director of DOL's Wage and Hour Division, wrote the County's second retained counsel a letter "in further response to our discussion concerning the application of section 7(k) of the Fair Labor Standards Act (FLSA) to employees of emergency medical service of Ben Hill County, Georgia." Halbert concluded that "The review of the EMT logs maintained by Ben Hill County disclosed that more than 50% of the fire protection/law enforcement calls responded to was for activities related to fire protection thus qualifying the EMTs as fire protection employees." Letter from Milton R. Halbert to Henry Huettner (May 17, 1989).[28] After becoming aware that all of the EMS

personnel had retained attorneys, the Wage and Hour Division closed its file.[29]

As noted above in section I, in June 1989, the County issued checks for "overtime compensation which the County has computed to be due you." This was overtime owed to the plaintiffs for the period from April 15, 1986 until the County changed its overtime payment policy in January 1988. Testimony of James Lee, Transcript, Volume III, p. 68. When asked why the County waited until 1989 to issue these checks to the plaintiffs, the County Administrator replied "We paid them very quickly after we got a ruling from the Labor Department as to what we were entitled to." Testimony of James Lee, Transcript, Volume III, p. 70.

Defendants observe that the FLSA only became applicable to governmental entities such as Ben Hill County on April 15, 1986. The court, cognizant of that and of their belief that the County might be exempt from the FLSA because of section 13(b)(1), finds that the County did not show "reckless disregard for the matter of whether" its conduct violated the FLSA. Accordingly, the County's violations of the FLSA are not willful and the two year statute of limitations applies.

VIII. Liquidated Damages

The court has found above that defendants violated section 7(a) of the FLSA and that plaintiffs are due back overtime compensation. Plaintiffs also claim they are due liquidated damages which would equal the amount of overtime compensation. Section 16(b) of the FLSA states "Any employer who violates the provisions of section 206 or 207 of this title shall be liable to the employee or employees affected in the amount of their ... unpaid overtime compensation ... and in an additional equal amount as liquidated damages...." 29 U.S.C. § 216(b).

The Portal-to-Portal Act provides a potential good faith defense to employers:
Liquidated damages

---

28. Halbert's letter does not mention the 80/20 rule.

29. The preceding five paragraphs are based on facts recorded by Brown. Plaintiffs' exhibit 12.

In any action ... to recover ... unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Acts of 1938, as amended [29 U.S.C.A. § 201 et seq.], if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was *in good faith and that he had reasonable grounds for believing* that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.

29 U.S.C. § 260.

"An employer who seeks to avoid liquidated damages bears the burden of proving that its violation was 'both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict.'" *Joiner v. City of Macon,* 814 F.2d 1537, 1539 (11th Cir.1987) (quoting *Reeves v. International Tel. & Tel. Corp.,* 616 F.2d 1342, 1352–53 (5th Cir.1980), *cert. denied,* 449 U.S. 1077, 101 S.Ct. 857, 66 L.Ed.2d 800 (1981) (quoting *Barcellona v. Tiffany English Pub, Inc.,* 597 F.2d 464, 468 (5th Cir.1979))). "Liquidated damages are mandatory absent a showing of good faith." *Joiner,* 814 at 1539. If the defendants carry their burden of proving good faith, the court may then exercise its sound discretion to award less than the full amount of liquidated damages.

The test for determining good faith is similar to the pre-*McLaughlin* test for willfulness.[30] The Eleventh Circuit has stated that "An employer, who knew or had reason to know that the FLSA applied, could not establish good faith as a defense." *Id.* In order to carry its burden of proof, "The employer must plead and prove that the act or omission complained of was: (1) in good faith; (2) in conformity with; and (3) in reliance on an administrative regulation, order, ruling, approval, or interpretation of an agency of the United States." *Thompson v. John L. Williams Co., Inc.,* 686 F.Supp. 315, 321 (M.D.Ga.1988) (quoting *Olson v. Superior Pontiac–GMC, Inc.,* 765 F.2d 1570, 1579 (11th Cir.1985)).

Defendants have not proven the three elements set out above. Instead they argue:

The actions of the County were reasonable in consulting with a well-credentialed attorney upon receipt of a complaint and by instituting the payment of overtime compensation upon his advice pending a final determination from the

---

**30.** At first glance, there is some confusion in the distinction between a willful violation and a good faith defense. The court believes that the established test for establishing good faith still remains the law in this Circuit for the following reasons.

The legislative history and plain meaning of the two-tiered statute of limitations which the Supreme Court reviewed in *McLaughlin* is not applicable to the liquidated damages sections of the FLSA and the Portal–to–Portal Act. *See McLaughlin,* 486 U.S. at 131–133, 108 S.Ct. at 1680–1681. The three year statute of limitations is an exception to the general two year limitations period. However, the FLSA provides for liquidated damages as a general rule; the employer bears the burden of proving good faith to avoid liquidated damages, and even then the court may exercise its sound discretion and still award liquidated damages.

In *McLaughlin,* the Supreme Court also considered the meaning of the word "willful" in common usage. *McLaughlin,* 486 U.S. at 133, 108 S.Ct. at 1681. The Court rejected a proposed intermediate "two-step standard that would deem an FLSA violation willful 'if the

employer, recognizing it might be covered by the FLSA, acted without a reasonable basis for believing that it was complying with the statute.'" *McLaughlin,* 486 U.S. at 134, 108 S.Ct. at 1682 (citation omitted). The Court determined that "It [the proposed intermediate test] would, however, permit a finding of willfulness to be based on nothing more than negligence, or, perhaps, on a completely good-faith but incorrect assumption that a pay plan complied with the FLSA in all respects." *Id.*

The Supreme Court recognizes a difference between willfulness and good faith, with willfulness requiring more reckless behavior on the part of the employer. As the court has mentioned above in section VII, the Supreme Court stated that more than unreasonable behavior is necessary for a finding of willfulness. "If an employer acts unreasonably, but not recklessly, in determining its legal obligation, then, its action ... should not be" considered willful. *McLaughlin,* 486 U.S. at 135 n. 13, 108 S.Ct. at 1682 n. 13. However, if an employer cannot establish that it acted reasonably, then it cannot avoid liquidated damages. 29 U.S.C. § 260.

Department of Labor. The Court has discretion not to award liquidated damages in this matter, and they are not appropriate under these facts.

Defendants' Post Trial Brief, p. 29. Before the court can exercise its discretion in deciding not to award liquidated damages, defendants must meet their burden of showing good faith. This they have failed to do.

The court does not believe that the defendants acted in good faith. First, the County did not attempt to examine whether or not the EMTs were exempt from the FLSA until October 1987. It is reasonable to presume that without any exploration of exemption, the EMTs would have been subject to the FLSA, and the County would have been in violation of section 7(a) from April 15, 1986 until October 1987. The County, aware that the FLSA was now applicable to at least certain of its employees, left its compliance with overtime compensation requirements up to the County Administrator, who used his best judgment. He did not have a basis for that judgment, however, because he failed to conduct an examination to determine whether the EMTs were exempt. The defendants have already pointed out that the statute and regulations are complex and difficult to interpret, yet for over a year the County failed to consult an attorney for assistance, and only did so after receiving complaints about the payment of overtime compensation.

Second, although the logs were available to the County, it never examined the logs to determine how much time the EMTs spent responding to each different category of calls to which they respond. The County never found out the amount of time the EMTs spent responding to vehicular accidents, fires, or patient transfers from a percentage standpoint, or any standpoint at all. Testimony of James Lee, Transcript, Volume III, pp. 65–67. The employer did not examine the records and logs to decide whether the EMTs met the 80/20 rule; it simply declared that 29 CFR § 553.212 did not apply to EMTs. This decision is not in conformity with or even allegedly based on any administrative ruling or letter opinion of any sort.

Third, although the County began to pay overtime compensation as if the EMTS were fire protection employees by January 1988, the defendants did not issue a check for overtime compensation for the period before that until June 1989, approximately one and one-half years later. The employer's explanation, that it was waiting to hear what the Wage and Hour District Director had to say, is not reasonable. When the District Director wrote that the EMTs were qualified as fire protection employees, the same conclusion the County's attorney had espoused, the County was still responsible for paying overtime calculated on that basis for the period prior to January 1988, the same basis for which it was currently paying overtime to the EMTs.

Defendants have not proved that its failure to pay overtime compensation was in conformity with and in reliance on an administrative regulation ruling or interpretation of the Wage and Hour Division or any other agency of the United States. At best, before Halbert's letter of June 1989, the defendants can argue that they were waiting for the Wage and Hour Division to provide the County with a ruling. Although Chasteen testified that he relied on letter rulings from the Administrative Director and these letter rulings set out the general test for determining whether an EMT can be qualified as a fire protection or law enforcement employee, those letters addressed different cases.

The letter rulings specifically state that the decision as to whether an EMS is substantially related to law enforcement or fire protection activities must be determined on the facts of the specific case.

The second test to determine if activities are "substantially related" to fire protection or law enforcement is that EMTs must be "regularly dispatched" to such things as fires or accidents. (See section 553.215 of Part 553.) There is no specific frequency of occurrence which establishes "regularity"; *it must be determined on the basis of the facts in each case.*

DOL October 9, 1987 Letter Ruling. The County never established a basis for its argument that the EMTs were regularly dispatched to such things as fires or accidents, one of the tests for determining that the EMTs provide services substantially related to fire protection or law enforcement activities.

The administrative letter rulings also address the issue of the good faith defense.

> Subsection (b)(1) of this section [section 10 of the Portal–to–Portal Act] states that, in the case of FLSA, the Agency referred to in subsection (a) shall be the Administrator of the Wage and Hour Division. However, it is our opinion that written rulings and opinions prepared for the signature of Wage and Hour staff below the level of the Administrator, when this position is not vacant, may not be relied on for purposes of good faith reliance under the Portal Act. This is so since neither the Portal Act, Reorganization Plan No. 6 of 1950 (15 F.R. 3174), nor delegations of authority issued pursuant to the latter make reference to Department staff below that level.

DOL October 9, 1987 Letter Ruling. The defendants attempt to base their position on the letter from Halbert, the District Director. However, the above letter ruling makes clear that a letter signed by Wage and Hour staff below the level of Administrator may not be relied upon for purposes of good faith reliance to avoid liquidated damages. Defendants in this case cannot avail themselves of the good faith defense.

The court finds that Ben Hill County has failed to show that its act or omission was in good faith and that it had reasonable grounds for believing that its act or omission was not a violation of the FLSA. The court therefore holds that the defendants are liable to the plaintiffs for an equal amount of their unpaid overtime compensation in liquidated damages.

IX. Conclusion

For the reasons stated above, the court GRANTS defendants' motion to withdraw its stipulation regarding the applicability of section 13(b)(1), however the court finds that the section 13(b)(1) exemption does not apply to ambulance services and the Ben Hill County EMTs are subject to the provisions of the FLSA. The court concludes that the Ben Hill County EMTs are covered by section 207(a) of the FLSA and that the section 7(k) exemption for employees engaged in fire protection or law enforcement activities does not apply to the plaintiffs in this action. The court finds that the plaintiffs are not entitled to minimum wage and overtime compensation for the hours spent on-call, exclusive of the hours actually working. The court holds the "fluctuating workweek" formula is not applicable, thus plaintiffs are entitled to one and one-half times the regular rate for all hours worked over forty in a workweek. The court finds that the defendants' violation of the FLSA does not rise to the level of willfulness, thus the two year statute of limitations is proper. The court concludes that defendants cannot avail themselves of a good faith defense and the plaintiffs are entitled to liquidated damages equal to the amount of unpaid overtime compensation.

In conclusion, the court ORDERS defendants to pay: plaintiff Spires all unpaid overtime compensation in accordance with the court's findings and an equal amount of liquidated damages from July 26, 1986 to the present; plaintiff Sanders all unpaid overtime compensation in accordance with the court's findings and an equal amount of liquidated damages from September 2, 1986 to the present; plaintiff Suzy Mercer all unpaid overtime compensation in accordance with the court's findings and an equal amount of liquidated damages from May 9, 1987 to April 29, 1988; and plaintiff Ray Mercer all unpaid overtime compensation in accordance with the court's findings and an equal amount of liquidated damages from November 14, 1986 to March 24, 1989. The court ORDERS the defendants to pay, upon determination, reasonable attorney's fees and the costs of this action.

SO ORDERED.