Fred SPIRES, Jr., Plaintiff–Appellee,

v.

BEN HILL COUNTY, d/b/a Ben Hill Emergency Medical Service, the Ben Hill County Commissioners, Ed Drexler, Freddie Sawyer and John Bishop, individually and in their official capacity as Commissioners, Defendants–Appellants.

David Allen SANDERS, Plaintiff–Appellee,

v.

BEN HILL COUNTY, d/b/a Ben Hill Emergency Medical Service, the Ben Hill County Commissioners, Ed Drexler, Freddie Sawyer and John Bishop, individually and in their official capacity as Commissioners, Defendants–Appellants.

Ray L. MERCER, Plaintiff–Appellee,

v.

BEN HILL COUNTY, d/b/a Ben Hill Emergency Medical Service, the Ben Hill County Commissioners, Ed Drexler, Freddie Sawyer and John Bishop, individually and in their official capacity as Commissioners, Defendants–Appellants.

Suzy Stone MERCER, Plaintiff–Appellee,

v.

BEN HILL COUNTY, d/b/a Ben Hill Emergency Medical Service, the Ben Hill County Commissioners, Ed Drexler, Freddie Sawyer and John Bishop, individually and in their official capacity as Commissioners, Defendants–Appellants.

No. 90–8882.

United States Court of Appeals, Eleventh Circuit.

Jan. 4, 1993.

Mary Mendel Katz, Thomas F. Richardson, Chambless Higdon & Carson, Macon, Ga., Robert W. Chasteen, Jr., Mills & Chasteen, P.C., Fitzgerald, Ga., for defendants-appellants.

John Edward Smith, III, Jay Sherrell & Smith, Fitzgerald, Ga., for plaintiffs-appellees.

Before HATCHETT and DUBINA, Circuit Judges, and CLARK, Senior Circuit Judge.

CLARK, Senior Circuit Judge:

This appeal presents the question whether defendant-appellant Ben Hill County, Georgia is liable under the Fair Labor Standards Act of 1938[1] ("FLSA") to plaintiff-appellees, employed as Emergency Medical Technicians, for overtime pay, and, if so, how such pay should be calculated under this Act and its supporting regulations. This case is decided along with *O'Neal et al. v. Barrow County Board of Commissioners et al.*, reported at 980 F.2d 674, which presents similar questions concerning the applicability of the overtime provisions of the FLSA to ambulance and rescue service workers.

I.

Section 7(a) of the FLSA mandates that an employer must compensate an employee at an overtime rate for all work performed in excess of forty hours during a work-week.[2] Section 7(k), however, provides a partial exemption for public agency employers from this standard by requiring that employees engaged in fire protection or law enforcement activities work an average of more than forty hours a week before they are entitled to overtime pay.[3] That is, a public agency need not pay an overtime rate to firefighters until they have worked an aggregate of 212 hours during a work period of 28 consecutive days or to law enforcement personnel until they have worked an aggregate of 171 hours during a work period of 28 consecutive days.[4] However, the Department of Labor has determined that a County, whose fire protection or law enforcement employees spend more than 20 percent of the total hours working in "nonexempt" activities, is not eligible for the partial exemption for overtime pay contained in section 7(k).[5] For purposes of this regulation, known colloquially as the "80/20" rule, "nonexempt work" is defined to be "work which is not performed as an incident to or

---

1. 29 U.S.C. §§ 201–219 (1988).

2. *Id.* § 207(a)(1).

3. *Id.* § 207(k).

4. 29 C.F.R. § 553.230 (1990).

5. *Id.* § 533.212.

in conjunction with ... fire protection or law enforcement activities." [6]

Although not specifically mentioned in the FLSA, the regulations state that "ambulance and rescue service" employees of a public agency may be treated as firefighting or law enforcement personnel for purposes of section 7(k) if they form "an integral part of the public agency's fire protection [or law enforcement] activities" [7] or if "their services are substantially related to [such] activities." [8] In order to meet this latter standard, a two-prong test must be satisfied: (1) the ambulance and rescue service employees must have "received training in the rescue of fire, crime, and accident victims or firefighters or law enforcement personnel injured in the performance of their respective duties"; and (2) these employees are "regularly dispatched to fires, crime scenes, riots, natural disasters, and accidents."

The County provides ambulance and emergency medical services to its citizens through its Emergency Medical Services facility located in Fitzgerald, Georgia which employed the plaintiffs as Emergency Medical Technicians ("EMTs"). EMTs originally worked three-cycle shifts: 24 hours on duty, 24 hours on call, and 24 hours off duty. In mid–1988, this work schedule was revised to a schedule of 24 hours on duty, 24 hours on call, and 48 hours off duty. The EMTs were paid a base salary calculated by multiplying the number of hours worked by the hourly rate. Base salary is augmented by $10.00 (later increased to $16.50) for each on-call day plus a straight hourly rate for actual time worked during an on-call day. In addition, if an EMT was also a shift captain, he received an extra $25.00 per pay period as shift captain pay. Thus, aside from on-call and shift captain pay, the EMTs were paid at a straight hourly rate regardless of the number of hours worked. Beginning in January, 1988, however, the County began paying overtime to the EMTs as if the County was subject to the FLSA, but exempt under the section 7(k) firefighter's provision. In June, 1989, the County paid the EMTs backpay for all overtime earned from April 15, 1986, the date the FLSA was made applicable to governmental entities, until the County made this change in its overtime policy in January, 1988.

The plaintiffs filed this action under the FLSA for overtime pay allegedly due to them under section 7(a) of the Act, claiming that section 7(k) did not provide an exemption for the County. After a bench trial, the district court ordered a judgment in favor of the plaintiffs for overtime pay, calculated in accordance with section 7(a) and an equal amount in liquidated damages.[9] Although the court did not specifically reach the issue whether the plaintiffs' activities were substantially related to those of firefighters or law enforcement personnel so as to fall within the section 7(k) exemption, it did hold that section 7(k) was inapplicable in any case because the plaintiffs spent more that 20% of their total working hours on nonexempt activities.[10] The County now brings this appeal.

## II.

As a preliminary matter, Ben Hill County argues that it is fully exempt from the overtime pay requirement contained in section 7(a) because EMTs fall within one of the specifically enumerated exceptions contained in the FLSA. Section 13(b)(1) states that section 7(a) "shall not apply with respect to any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 304 of Title 49." [11] The County contends that because the Secretary of Transportation has the power to establish maximum hours of service under

6. *Id.* § 553.212(a).

7. *Id.* §§ 553.210(a) & .211(b).

8. *Id.* § 553.215(a).

9. *Spires v. Ben Hill County,* 745 F.Supp. 690, 701, 706–09 (M.D.Ga.1990).

10. *See id.* at 699–701.

11. 29 U.S.C. § 213(b)(1).

the Motor Carrier Act[12] for EMTs, it is fully exempt from coverage under section 7(a) of the FLSA.

The Motor Carrier Act grants authority to the Secretary of Transportation to regulate the maximum hours of service of employees who are employed (1) by a common carrier by motor vehicle; (2) engaged in interstate commerce; and (3) whose activities directly affect the safety of operations of such motor vehicles.[13] The Department of Labor's jurisdiction under the FLSA and the Department of Transportation's jurisdiction under the Motor Carrier Act are mutually exclusive and there are no overlapping areas of jurisdiction.[14] To avoid any conflict between these Acts, Congress determined that the Secretary of Transportation need not actually exercise his power to regulate under the Motor Carrier Act; an exemption under section 13(b)(1) is created so long as the Secretary has the authority to regulate over a particular category of employees.[15]

In determining the scope and reach of a particular regulatory statute, this court grants considerable deference to the construction of that statutory scheme given by the executive department which is authorized by law to administer it.[16] Here, we have the benefit of a previous determination by the Interstate Commerce Commission[17] on the issue of whether ambulance and rescue services fall within the jurisdiction of the Motor Carrier Act. In *Lonnie W. Dennis*,[18] the ICC specifically found that the "Interstate Commerce Act was not intended to confer jurisdiction upon this Commission to regulate the operation of carriers transporting corpses or operating an ambulance service in interstate or foreign commerce."[19] The Commission based this finding on the view that:

> [t]he term ambulance service implies emergency situations and a freedom of movement in the event of a train wreck, cyclone, bombing, or other catastrophe. In such instances, it is vital to the public interest for ambulances to be sent over the most practicable routes to whatever destinations their services may be needed, irrespective of any limitation upon operating authority or lack thereof. Consequently, because of its emergency nature and the necessary flexible character, the regulation of such service under the certificate or permit requirements of the act would in reality be contrary to the public interest.[20]

The reasoning of *Dennis* has been specifically adopted by the Department of Transportation in determining the reach of the Motor Carrier Act.[21] The implementing rules, known as the Federal Motor Carrier Safety Regulations ("FMCSR"), explicitly state that "[t]he transportation of human corpses or sick and injured persons; and [t]he operation of fire trucks and rescue

---

**12.** 49 U.S.C. §§ 301–327 (1976) (repealed 1978). Section 304 was subsequently revised and reenacted at 49 U.S.C. § 3102(b)(1) (1988).

**13.** 49 U.S.C. § 3102(b)(1); 29 C.F.R. § 782.2(a) (1990); *Boutell v. Walling*, 327 U.S. 463, 467, 66 S.Ct. 631, 634, 90 L.Ed. 786 (1946); *United States v. American Trucking Ass'ns, Inc.*, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940).

**14.** *See Morris v. McComb*, 332 U.S. 422, 437, 68 S.Ct. 131, 138, 92 L.Ed. 44 (1947).

**15.** *See id.* at 436, 68 S.Ct. at 137.

**16.** *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council Inc.* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984); *Levinson v. Spector Motor Serv.*, 330 U.S. 649, 662, 67 S.Ct. 931, 938, 91 L.Ed. 1158 (1947); *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).

**17.** Prior to the formation of the Department of Transportation, the ICC was entrusted with administering the Motor Carrier Act, However, the ICC's authority under that Act was transferred to the Department after its creation. *See* 49 U.S.C. § 1655(e)(6)(C) (1976) (repealed 1983). By virtue of this transfer of authority, all orders of the ICC previously issued were adopted by the Secretary of Transportation. *See* Department of Transportation Act, Pub.L. No. 89–670, § 12, 80 Stat. 931, 949 (1966).

**18.** 63 M.C.C. 66 (1954).

**19.** *Id.* at 70. The Motor Carrier Act was enacted and codified as an amendment to the Interstate Commerce Act. *See* 49 U.S.C. § 301 historical note (1976).

**20.** *Id.*

**21.** *See* 53 Fed.Reg. 18,049 (1988); 40 Fed.Reg. 50,677 (1975).

vehicles while involved in emergency and related operations" are not subject to the FMCSR.[22]

██ In light of the Department of Transportation's long practical experience in this field, we agree with its analysis in *Lonnie W. Dennis* that Congress did not intend the jurisdiction of the Motor Carrier Act to extend to the provision of transportation for ambulance services.[23] We note that the Ninth Circuit in *Jones v. Giles*[24] reasoned along the same lines in concluding that a privately owned ambulance and paramedic service did not fall within the section 13(b)(1) exemption.[25] The *Jones* court specifically distinguished the reasoning of *Benson v. Universal Ambulance Serv., Inc.*[26] in which the Sixth Circuit held that a private ambulance service was subject to the jurisdiction of the Motor Carrier Act and that its employees therefore could not have the benefit of the overtime provisions of section 7(a).[27] We believe that not only did the Sixth Circuit misconstrue the structure of the Motor Carrier Act in reaching this conclusion for the reasons noted by the Ninth Circuit,[28] it also did not consider the Department of Transportation's own interpretation of the Act as applied to ambulance services. For the reasons expressed above, this court finds that the view of the Ninth Circuit is the better reasoned position and therefore joins it in holding that ambulance and rescue services

are not subject to the Department of Transportation's jurisdiction under the Motor Carrier Act to set maximum hours of service for employees of motor common carriers.

### III.

██ As we noted earlier, the district court, in ordering a judgment for the plaintiffs, did not specifically reach the issue of whether the County was entitled to the section 7(k) exemption because it held that this exemption was nevertheless inapplicable on the ground that the plaintiffs spent more than 20% of their total working hours on nonexempt activities in violation of the 80/20 rule. By not first examining whether the County had made a showing under the "substantial relation" test that it was entitled to the section 7(k) exemption, the district court unnecessarily reached the legal issue of whether the 80/20 rule is applicable to ambulance and rescue workers.* The district court, however, clearly intimated that the County had not met its burden in satisfying the substantial relation test, and, after our own review, we find that this conclusion was justified.[29] We therefore affirm the district court's order and judgment solely on that basis.

As we noted earlier, a public agency is eligible for the section 7(k) exemption for

---

22. 49 C.F.R. § 390.3(f)(3)–(4) (1990).

23. This conclusion is buttressed by the fact that, unlike the applicant in *Lonnie W. Dennis*, the ambulance and rescue services at issue in this case are owned and operated by a municipal government. The terms of the Motor Carrier Act do not explicitly extend to transportation services performed by a state or its political subdivision, *see* 49 U.S.C. §§ 3102(b)(1), 10102(13)–(15), and this view has been adopted by the Department of Transportation's administrative interpretation of the Act. 49 C.F.R. § 390.3(f)(1); 53 Fed.Reg. 18,049 (1988).

24. 741 F.2d 245 (9th Cir.1984).

25. *See id.* at 248–49.

26. 675 F.2d 783 (6th Cir.1982).

27. *See id.* at 785–87.

28. *See Jones,* 741 F.2d at 249–50.

* We do agree with the district court that the regulations clearly evince a design that if ambulance and rescue workers are treated synonymously with firefighters or law enforcement personnel for purposes of section 7(k), they are also subject to the 80/20 rule that is applicable to these principal occupations. However, to satisfy the rule an employee's nonexempt work must exceed "20 percent of the *total hours* worked by that employee." 29 C.F.R. § 533.-212(a) (emphasis added).

Since the evidence in this case did not reflect the actual time worked by employees on each call but instead reflected an analysis of the types of calls, it is difficult to extrapolate the actual time. However, the district court's findings with respect to the 80/20 rule support the conclusion reached here that the EMT's work did not meet the "substantial relation" test necessary for the County to be entitled to the section 7(k) exemption.

29. *See Spires,* 745 F.Supp. at 701 n. 21.

its ambulance and rescue service workers if their work is "substantially related to firefighting or law enforcement activities."[30] After examining the district court's findings of fact, we conclude that the County failed to satisfy the second prong of the substantial relation test which requires that its EMTs be "regularly dispatched to fires, crime scenes, riots, natural disasters, and accidents."[31] Under this prong, the County was required to show that the plaintiffs were regularly dispatched to various incidents and events that are commonly associated with either fire protection or law enforcement activities. Although the regulation does not define what constitutes "regularity", the Administrator of the Wage and Hour Division has stated in a letter ruling that this term is not intended to indicate any "specific frequency of occurrence ... it must be determined on the basis of the facts in each case."[32]

At the outset, we note that the County has conceded, in both the district court and on this appeal, that the majority of the calls answered by the EMTs are for patient transfers. As many as two or three of these transfers are completed during a single shift. Typically, these patient transfers require the EMTs to transfer patients from Fitzgerald to other hospitals in Georgia or to airports for further transportation. This type of activity clearly does not fall within the definitions of either firefighting or law enforcement contained in 29 C.F.R. §§ 553.210 and .211. Although we recognize that this evidence does not directly speak to whether or not the EMTs are regularly dispatched on firefighting or law enforcement activities, it does tend to show that a large proportion of an EMT's actual work hours are spent on unrelated activities.

The most comprehensive evidence concerning the various types of calls answered by the EMTs was contained in records culled from the radio logs of various fire and police departments in the County for three random months: October 1987, January 1988, and August, 1989.[33] During these three months, the total percentage of calls involving either accidents or fires to which the EMTs responded was never greater than 24%.[34] As the district court noted, these figures generally correspond with the County's own analysis of EMT calls for these same months that were prepared in response to a Department of Labor investigation. For example, a letter from the County Attorney to the Department of Labor revealed that during the period from June, 1987 to June, 1988, out of a total of 1683 calls received by the EMTs for this thirteen month period, only 237 or 14% were for accidents and a substantially fewer number of calls were for fires.[35]

More importantly, however, the evidence extracted from these representative radio logs indicates the relative frequency with which the EMTs answered calls in conjunction with either firefighters or law enforcement personnel in the County. For example, in January, 1988, the EMTs answered only 19% of all fire calls answered by the Fitzgerald Fire Department; 17% of the fire calls answered by the Ben Hill County Volunteer Fire Department; 35% of the accident calls received by the Ben Hill County Sheriff's Department; 25% of the accident calls received by the Fitzgerald Police Department; 20% of the fire calls received by the Ben Hill County Sheriff's Department; and 20% of the fire calls re-

**30.** 29 C.F.R. § 553.215(a).

**31.** *Id.* It is therefore unnecessary for us to consider whether or not the "trained to rescue" prong of the substantial relation test has been met.

**32.** Department of Labor Admin. Ltr. Rul. of Oct. 9, 1987, *reprinted in Fair Labor Standards Handbook,* App. III, at 173–74 (Mar.1988).

**33.** *See Spires,* 745 F.Supp. at 701 & n. 19.

**34.** Although these logs do not specify whether or not the EMTs may have answered calls related to law enforcement activities, the County failed to produce any evidence, beyond its own bare assertions, that the EMTs ever responded to calls in conjunction with law enforcement officials.

**35.** *See id.* at 700–01.

ceived by the Fitzgerald Police Department. The figures from the other two months from which records were collected are also consistent with these percentages.[36]

In light of our duty to narrowly construe exemptions to the FLSA against the employer asserting them,[37] we conclude that the County failed to carry its burden of showing that its EMTs are "regularly dispatched" to fires, crime scenes, and accidents. Indeed, the plaintiffs presented the bulk of the relevant evidence on this issue at trial. Briefly, this evidence indicated that the vast majority of the EMTs' work hours were spent on activities, such as patient transfers, that are not related to fire protection or law enforcement activities. In addition, the plaintiff's evidence showed that the frequency with which they responded to such calls in conjunction with the police and fire departments in the County was quite low. Because the County failed to establish that the activities of its EMTs are "substantially related" to that of fire fighters or law enforcement, we conclude that the County is not eligible for the section 7(k) exemption.

### IV.

██ Lastly, the County argues that the district court erred in ordering an award to the plaintiffs of liquidated damages in an amount equal to their back overtime pay calculated in accordance with section 7(a). The district court awarded these additional damages under authority of section 16(b) of the FLSA which states that "[a]ny employer who violates the provisions of ... section 207 of this title shall be liable to the employee or employees affected in the amount of their ... unpaid overtime compensation .. and in an additional equal amount as liquidated damages."[38] Section 11 of the Portal-to-Portal Act, however, provides a good faith defense to employers to an award of liquidated damages "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]."[39] If a court determines that an employer has established a good faith defense, it may, "in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title."[40] In articulating the standard for establishing a good faith defense, we have previously stated that:

> An employer who seeks to avoid liquidated damages bears the burden of proving that its violation was "both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict." An employer who knew or had reason to know that the FLSA applied, could not establish good faith as a defense. Thus, the district court's decision whether to award liquidated damages does not become discretionary until the employer carries its burden of proving good faith. In other words, liquidated damages are mandatory absent a showing of good faith.[41]

In ordering an award of liquidated damages, the district court found that the Ben Hill County Commission was aware in 1986

**36.** In addition, if there is evidence tending to show that there is a regular procedure, system, or protocol by which ambulance and rescue service workers are notified and dispatched to events relating to firefighting or law enforcement activities, this would contribute to a showing that the "regularly dispatched" prong of the substantial relation test has been satisfied. The County failed to present any evidence to this effect. Indeed, the director of Emergency Medical Services testified that there was no organized method of contacting EMTs to respond to structure fires and that they responded only to those structure fires in Fitzgerald that they "find out about" through their scanners.

**37.** *See Donovan v. Bereuter's, Inc.,* 704 F.2d 1034, 1036 (8th Cir.1983).

**38.** 29 U.S.C. § 216(b).

**39.** *Id.* § 260.

**40.** *Id.*

**41.** *United States v. McKennon,* 814 F.2d 1539, 1539 (11th Cir.1987) (citation omitted); *see also* 29 C.F.R. § 790.13–.22.

that the FLSA was applicable to certain county employees. The commissioners turned over the task of conforming the County's pay policies to the County Administrator, James Lee, and the County Attorney, Robert W. Chasteen. In September, 1987, plaintiffs' counsel wrote Lee notifying the County of their claim to overtime pay in accordance with section 7(a). Chasteen and Lee then consulted outside counsel who recommended that the County pay the EMTs in accordance with the firefighter's partial exemption in section 7(k). Shortly thereafter in late 1987, the Department of Labor began an investigation of the County's overtime pay policy as applied to the EMTs. On April 20, 1988, the compliance officer in charge of this investigation notified Lee and Chasteen that the County's overtime policy was in violation of section 7(a). Other meetings were held with officials of the Department of Labor, including the District Director of the Wage and Hour Division, Milton Halbert, in May and July, 1988. In August, 1988, Chasteen sent a letter to the Department of Labor which reiterated the County's view that it was entitled to either the full exemption contained in section 13(b) or the partial exemption in 7(k). Although Chasteen claimed that he based this view on opinion letters previously issued by the Administrator of the Wage and Hour Division, he did not conduct an actual examination of how much time the EMTs spent at any particular group of activities. Finally, in May, 1989, Halbert wrote to the County that after further examination of the EMT logs, he determined that the EMTs employed by the County qualified for the partial firefighter's exemption. As noted earlier, the County began paying overtime to the EMTs as if they were firefighters under the section 7(k) exemption in January, 1988, and in June, 1989 paid back overtime pay calculated in this fashion for the period from April, 1986 to January, 1988.[42]

We agree with the district court that, for the period up to January, 1988, the County

failed to show that it had made a good faith effort based on reasonable grounds for not conforming its overtime policies to the FLSA. Although the County knew that the EMTs might be subject to the FLSA as early as 1986, it took no action whatsoever to investigate its compliance with this statute until it was contacted by the plaintiffs' counsel in September, 1987. In addition, even after the County's outside counsel had rendered an opinion that the EMTs were eligible for the section 7(k) exemption in late 1987, the County failed to make back overtime payments. The district court was correct in concluding that the County's proffered rationale for this long delay in making back payments—that it was awaiting a final determination from the Department of Labor's investigation—was unreasonable. At least as early as April, 1988, both the County's outside counsel and the Department of Labor's compliance officer had concluded that the County was liable to pay *some* overtime pay, whether or not calculated under the firefighter's exemption, to the EMTs. Thus, in light of the information available to the County, it was simply unreasonable for it to have delayed in making back overtime pay.

By June, 1989, the County's EMT overtime policy was in full compliance with its view that the EMTs should be paid according to the section 7(k) exemption. Since that date, the County contends that it has been relying on the Halbert letter of May, 1989 for its policy of paying the EMTs according to the section 7(k) firefighter's exemption. However, as the district court noted, the Department of Labor had determined in an administrative ruling that opinion letters " 'prepared for the signature of the Wage and Hour staff below the level of the Administrator ... may not be relied on for purposes of good faith reliance under the Portal Act.' "[43] Because Halbert was neither the Administrator nor acting in that position, the County could not rely on his opinion to establish a good faith defense. As a result, we agree with the district

---

**42.** *See Spires,* 745 F.Supp. at 704–06.

**43.** *Spires,* 745 F.Supp. at 709 (quoting Department of Labor Admin. Ltr. Ruling of October 9, 1987, *reprinted in Fair Labor Standards Handbook,* App. III. (Mar. 1988)).

court that the County's actions prior to June, 1989 vitiate any showing that it acted in good faith after that date.

## V.

For the foregoing reasons, the order and judgment of the district court is AFFIRMED.