980 F.2d 674
 124 Lab.Cas. P 35,761, 1 Wage & Hour Cas.2d
(BNA) 306
 Michael Douglas O'NEAL, Robert A. Zillman, Jerry L. Johnson,
Gary L. Webb and Michael G. Walling, Plaintiffs-Appellants,
v.
BARROW COUNTY BOARD OF COMMISSIONERS, Billy Emmett,
individually and in his official capacity as Director of
Barrow County E.M.S., Don Holliday, individually and in his
official capacity as Chairman of Barrow County Board of
Commissioners and Larry Price, individually and in his
official capacity as Operations Director of Barrow County,
Defendants-Appellees.
 No. 90-8803.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 4, 1993.
 
 Curtis G. Shoemaker, Athens, Ga., for plaintiffs-appellants.
 Kathryn M. Zickert, Zickert & White, Decatur, Ga., William D. Healan, Jr., Winder, Ga., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of Georgia.
 Before HATCHETT and DUBINA, Circuit Judges, and CLARK, Senior Circuit Judge.
 CLARK, Senior Circuit Judge:
 
 
 1
 Plaintiffs-appellants, employees of Barrow County's Emergency Medical Service, bring this appeal from the district court's grant of summary judgment for defendant-appellee Barrow County on their suit seeking to recover overtime compensation allegedly due them under the Fair Labor Standards Act of 1938[1] ("FLSA"). 743 F.Supp. 859. This case is decided along with Spires et al. v. Ben Hill County et al., 980 F.2d 683, which presents similar issues regarding the application of the overtime provisions of the FLSA to ambulance and rescue service workers. Because we find that the district court's order granting summary judgment does not dispose of all of the disputed material issues of fact, we vacate the district court's judgment and remand the case for further proceedings.
 
 I. FACTS
 
 2
 Plaintiffs are current or past emergency medical technicians ("EMTs") or paramedics employed by the Barrow County Emergency Medical Service (the "Service"). The Service responds to a variety of different calls in the County, including emergency medical calls, automobile and other accidents, crime scenes, and fire emergencies. The EMTs also perform non-emergency medical transfers of patients and are dispatched on a stand-by basis to non-emergency structure fires. The Service is an independent, free-standing agency, not connected to or operated with any fire or police agency in the County. While serving on duty but not responding to a call, the employees of the Service typically perform maintenance on their ambulances and work areas. In addition, employees are rotated through service as the dispatcher for an 8-hour segment of their 24-hour shifts. Under its overtime pay policy adopted in October of 1985, the County currently compensates plaintiffs at a rate of one-and-a-half times their regular pay rate for all hours worked in excess of 106 hours in a two-week pay period.
 
 II. DISCUSSION
 A. The "Substantially Related" Standard
 
 3
 Section 7(a) of the FLSA mandates that an employer must compensate an employee at an overtime rate for all work performed in excess of forty hours during a workweek.[2] Section 7(k), however, provides a partial exemption for specified public agency employers: employees engaged in fire protection activities must work an aggregate of 212 hours during a work period of 28 consecutive days and employees engaged in law enforcement activities must work an aggregate of 171 hours during the same period before being entitled to overtime compensation.[3] Although not specifically mentioned in the FLSA, the implementing regulations state that "ambulance and rescue service" employees of a public agency may be treated as firefighting or law enforcement personnel for purposes of section 7(k) if they "form an integral part of the public agency's fire protection [or law enforcement] activities"[4] or if "their services are substantially related to [such] activities."[5] We are concerned here only with the latter "substantially related" standard.
 
 
 4
 Before we further consider this standard, we note that any exemption from the FLSA, including that set out in section 7(k) and the implementing regulations, must be narrowly construed against the employer.[6] We find that a narrow construction of the "substantially related" standard of 29 C.F.R. § 553.215 is particularly imperative. First, in drafting section 7(k), Congress did not specifically mention extending the exemption to ambulance and rescue service employees. Indeed, the only mention of so extending the exemption in the legislative history of section 7(k) is in a colloquy that took place on the House floor as section 7(k) was being debated; this colloquy indicates that Congress intended that the exemption be so extended only when the employees' activities "substantially include rescue and ambulance work associated with fire protection and law enforcement."[7] The intention to extend the exemption to ambulance and rescue service employees is not reflected either in the statute itself or in congressional reports related to the statute.[8] Thus, the extension as written into the regulations should be very narrowly construed. Second, the purpose of the "substantially related" standard is obviously to ensure that ambulance and rescue service personnel who are acting like firefighters and law enforcement officers are treated as such, regardless of whether they can be made an "integral part of" the fire or law enforcement department. For example, integration of an emergency medical service into the fire department may be impossible because the fire department is entirely volunteer. The purpose of the "substantially related" standard certainly is not to cast the exemption net any more broadly than does the "integral part of" test. Thus, we will construe the "substantially related" standard very narrowly. We also keep in mind that the burden of proving the exemption is upon the employer, as is the burden of proving any exemption under the FLSA.[9]
 
 
 5
 In order to meet the "substantially related" standard, a two-prong test must be satisfied: 1) the ambulance and rescue service employees must have "received training in the rescue of fire, crime, and accident victims or firefighters or law enforcement personnel injured in the performance of their respective duties"; and 2) these employees must be "regularly dispatched to fires, crime scenes, riots, natural disasters, and accidents."[10] On the record submitted to the district court, the County failed to meet its burden of proving that, as a matter of law, it met this two-part test. We discuss the two parts of the test separately below.
 
 1. The "Training in Rescue" Requirement
 
 6
 To meet the first prong of the "substantially related" standard, the County must show that the EMTs "have received training in the rescue of fire, crime, and accident victims or firefighters or law enforcement personnel injured in the performance of their respective duties...."[11] The Department of Labor, in a Wage and Hour Division Administrative Letter Ruling, has explained this first prong of the standard as follows:
 
 
 7
 The first test requires that EMTs be trained to rescue individuals who have been injured or who are in danger of being injured. Under these circumstances, the term "rescue" refers to actions taken to free a victim from imminent danger or harm by the most expeditious means. In many cases, this may require an EMT to take action beyond merely applying medical treatment such as bandaging, administering oxygen, or transporting an individual to a hospital. For instance, there may be situations where the EMTs, as the first responders at the scene of an automobile accident, must extricate an injured person from a vehicle in order to begin treatment and preparation for movement as soon as possible.... This means that an EMT must be properly trained to operate special types of equipment, such as hydraulic "spreaders" or chemical foam extinguishers, in case they are available for their use at the accident scene. Therefore, we interpret the requirement that an EMT be "trained to rescue" as meaning that the individual has knowledge of the basic life-saving procedures and life support procedures (i.e. CPR, administering oxygen, and extrication techniques). However, it is not necessary for an EMT to routinely perform any or all of these procedures in order to meet the requirements of the first test referred to above.[12]
 
 
 8
 We find the Department of Labor's interpretation persuasive. Accordingly, we hold that EMTs are "trained to rescue" only if they have knowledge of extrication techniques, that is, only if they have some specific training in methods of "free[ing] a victim from imminent danger or harm by the most expeditious means."
 
 
 9
 The district court erred in its determination that the County proved compliance with the "trained to rescue" requirement because the evidence offered by the County failed to show that such training was a prerequisite to employment. We remand for the district court to require the County to further develop the facts regarding its training requirements and for the court to determine whether the County meets the "trained to rescue" requirement as interpreted in the Department of Labor's Letter Ruling.
 
 2. The "Regularly Dispatched" Requirement
 
 10
 To satisfy the second prong of the "substantially related" test, the County must show that the EMTs "are regularly dispatched to fires, crime scenes, riots, natural disasters and accidents."[13] The Department of Labor has said:
 
 
 11
 The second test to determine if activities are 'substantially related' to fire protection or law enforcement is that EMTs must be 'regularly dispatched' to such things as fires or accidents.... There is no specific frequency of occurrence which establishes 'regularity'; it must be determined on the basis of the facts of each case.[14]
 
 
 12
 Although we agree with the Department of Labor that a case by case analysis is appropriate, we establish here some guidelines for the analysis.
 
 
 13
 We first consider which dispatches are "to fires, crime scenes, riots, natural disasters and accidents." In concluding that the EMTs are "regularly dispatched" to these types of rescues, the district court considered only those dispatches that fell in the categories of fires, crimes, and automobile accidents.[15] The district court was correct in its selection of these categories, and only these categories, of dispatches.[16] Although the test as set out in the regulation refers generally to "accidents," not just to automobile accidents, the regulation may not reasonably be construed to mean all accidents. The purpose of the regulation's two-part test is to determine if the services the EMTs provide are "substantially related to firefighting or law enforcement activities." The information submitted to the district court by the parties indicates that many of the accidents to which the EMTs respond are not related to either of these activities; for example, many of the accidents involve household falls.[17] The only category of "accidents" in the information submitted by the parties that can be said to be substantially related to either firefighting or law enforcement activities is "automobiles accidents." Accordingly, the district court properly considered only dispatches to fires, crimes, and automobile accidents in determining whether the EMTs are "regularly dispatched to fires, crime scenes, riots, natural disasters and accidents."[18]
 
 
 14
 We next consider whether the dispatches to fires, crimes, and automobile accidents are "regular." In concluding that these dispatches are regular, the district court considered only the number of such dispatches per week, month, or year. This is insufficient. The district court should have considered the following factors: (1) the percentage of the Service's total calls that are dispatches to fires, crimes, and automobile accidents;[19] (2) the percentage of total EMT man-hours spent responding to dispatches to fires, crimes, and automobile accidents; and (3) the percentage of the total number of all fires, automobile accident, and police calls that occur throughout the county to which the Service is dispatched.[20] The parties provided the district court with a plethora of numbers and statistics; the plaintiffs provided information relevant to factor one, and the County provided information relevant to factor two. None of the information provided by the parties, however, is helpful as to factor three. To determine whether the Service is "regularly dispatched" to fires, it is imperative that the district court know whether the Service is dispatched to every fire, every other fire, or one in every 100 fires to which the fire department is called.[21] Likewise, to determine whether the Service is "regularly dispatched" to crime scenes and automobile accidents, the district court must know under what circumstances and how often the Service is dispatched to respond to police calls. We do not speculate as to what percentage under each of these three factors will satisfy the "regularly dispatched" requirement in this case. We leave this to the district court's determination following further factual development.
 
 B. The Twenty Percent Limitation
 
 15
 The implementing regulations to section 7(k) provide that an employer is not entitled to an exemption for employees engaged in fire protection or law enforcement activities if those employees spend more than 20 percent of their total hours working in "nonexempt" activities. Specifically, this regulation, which is known colloquially as the "80/20" rule, provides:
 
 
 16
 Employees engaged in fire protection or law enforcement activities as described in §§ 553.210 and 553.211, may also engage in some nonexempt work which is not performed as an incident to or in conjunction with their fire protection or law enforcement activities.... The performance of such nonexempt work will not defeat [the section 7(k) exemption] unless it exceeds 20 percent of the total hours worked by that employee during the workweek or applicable work period.[22]
 
 
 17
 We find that the district court erred in concluding that the 80/20 rule is inapplicable to rescue and ambulance service personnel.
 
 
 18
 This regulation does not specifically mention rescue and ambulance service personnel. It does, however, specifically refer to §§ 553.210 and 553.211. These two sections, first, define fire protection and law enforcement activities for purposes of the section 7(k) exemption and, second, bring rescue and ambulance service personnel under the section 7(k) exemption if they form "an integral part" of these activities. These two sections also specifically refer to § 553.215, which sets out the two-prong "substantially related" test, discussed above, for bringing rescue and ambulance service personnel under the section 7(k) exemption. Section 553.212, which sets out the 80/20 rule, immediately follows §§ 553.210 and 553.211 and almost immediately precedes § 553.215. We find that a consistent reading of this group of regulations requires that the 80/20 rule be made applicable to rescue and ambulance service personnel, whether they are brought within the section 7(k) exemption by § 553.210, § 553.211, or § 553.215.
 
 
 19
 Other courts that have considered this issue agree. As one court has said:
 
 
 20
 In practical terms, a holding that the 20% rule does not apply to § 553.215 would mean that the County is free to dispatch its EMTs and paramedics to do any job (road repair, sanitation disposal, parks and recreation) without fear of losing the 7(k) overtime exemption. Clearly, such a ludicrous result is not contemplated by the regulations at issue.[23]
 
 This same court went on to note:
 
 21
 Indeed, it would be anomalous to offer firefighters "more protection" than the ambulance service personnel whose status under the exemption is determined by the fact that they work in conjunction with the firefighting personnel.[24]
 
 
 22
 We agree. The regulations clearly evince a design that if rescue and ambulance service workers are treated synonymously with firefighters or law enforcement personnel for purposes of section 7(k), they are also subject to the 80/20 rule that is applicable to these principal occupations. It would be patently unfair to extend the regulatory protection of the 80/20 rule to firefighters and law enforcement personnel who come under the section 7(k) exemption by specific congressional mandate, but not extend this protection to rescue and ambulance service workers who are brought under the section 7(k) exemption only by implementing regulation. We therefore conclude that the 80/20 rule does apply to ambulance and rescue service workers who are brought within the coverage of the partial exemption in section 7(k) by 29 C.F.R. § 553.215.
 
 
 23
 Having concluded that the 80/20 rule is applicable, we now consider what constitutes "nonexempt work" for purposes of determining whether the 20% test has been satisfied. The regulation provides that nonexempt work is that "which is not performed as an incident to or in conjunction with [the employees'] fire protection or law enforcement activities."[25] The regulation also provides the following example of nonexempt work:
 
 
 24
 For example, firefighters who work for forest conservation agencies may, during slack times, plant trees and perform other conservation activities unrelated to their firefighting duties.[26]
 
 
 25
 As this example makes clear, nonexempt work generally inures to the benefit of the employer. It is work that generally benefits the employer, which the employer requires its employees to do while they are not engaged in activities related to their fire protection or law enforcement duties.
 
 
 26
 It appears from the record submitted to the district court in this case that most of the EMT man-hours spent responding to calls is nonexempt work. For example, the work that the County has characterized as "medical emergency hours"[27] is nonexempt, as is the work that the County has characterized as "accident hours."[28] These categories of work are nonexempt because they are unrelated to fire protection or law enforcement; they do not include time spent responding either to fires or to calls related to law enforcement, such as gunshots, hangings, stabbings, fights, and domestic disputes.[29] Likewise, time spent on patient transfers is nonexempt, as it is unrelated either to fire protection or law enforcement. Our conclusion that this non-exhaustive list constitutes nonexempt work is bolstered by the fact that, for most of these calls, the County no doubt receives payment from the patient whom the EMTs are called upon to assist; thus, the work inures to the benefit of the County.[30]
 
 
 27
 In addition to determining whether hours spent responding to calls is nonexempt work, the district court on remand must also determine how to treat those hours when the EMTs are at work at the Service headquarters but are not responding to calls.[31] According to information provided to the district court by the County, these hours make up the great majority of the EMTs' working hours. The district court noted that the EMTs spend 8 hours of their 24-hour shift on dispatch duty. The regulations specifically provide that "support activities [such] as those performed by dispatchers" are not fire protection activities.[32] Accordingly, these 8-hour dispatcher shifts clearly constitute nonexempt work. The remainder of the hours spent by the EMTs awaiting calls, however, is related to fire protection or law enforcement in that the EMTs are awaiting fire and police calls just as they are awaiting medical emergency and accident calls. Thus, the station time that is not spent on dispatcher service is exempt work, except to the extent the County may require the EMTs to perform tasks that are unrelated to fire protection or law enforcement.
 
 
 28
 We find that the 80/20 rule works well in conjunction with the "substantially related" test of § 553.215. As we noted above, the "substantially related" standard does not delineate a specific frequency of occurrence which establishes "regularity" or specify what quantum of an EMT's total workday must be occupied in firefighting or law enforcement activities. By superimposing the 80/20 rule, only those public agencies whose ambulance and rescue service employees spend a substantial amount (at least 80%) of their work hours in related activities are eligible for the section 7(k) exemption. Thus, an EMT who is regularly dispatched to fires or crime scenes, but spends only a small fraction of his work hours on activities "incident to or in conjunction with" these type of calls does not come under the section 7(k) exemption. This interpretation of the regulations is not inconsistent with Congress' intent that rescue and ambulance service workers be partially exempt under section 7(k) only if their work is "substantially related" to that of the principal occupations covered by the exemption.
 
 III. CONCLUSION
 
 29
 On remand, the district court is directed to conduct further proceedings to determine whether the County has met its burden of proving that the plaintiffs are "trained to rescue" and are "regularly dispatched" to firefighting or law enforcement activities. If so, the district court must then further consider whether the plaintiffs spend more than 20% of their actual working time in nonexempt activities.[33] Accordingly, the order of the district court is VACATED and the case REMANDED for further proceedings not inconsistent with this opinion.
 
 
 
 [1]
 29 U.S.C. §§ 201-219 (1988)
 
 
 [2]
 Id. § 207(a)(1)
 
 
 [3]
 29 C.F.R. § 553.230 (1990)
 
 
 [4]
 Id. § 553.210(a) & .211(b)
 
 
 [5]
 Id. § 553.215(a)
 
 
 [6]
 Mitchell v. Kentucky Finance Co., 359 U.S. 290, 295, 79 S.Ct. 756, 759, 3 L.Ed.2d 815 (1959)
 
 
 [7]
 The full colloquy is as follows:
 MR. MIZELL ...
 Mr. Speaker, I would like to direct a question to the ranking member of the General Labor Subcommittee (MR. QUIE) with respect to section 6 of the conference report, "Federal and State employees."
 That section departs from the standard FLSA "hours of work" concept for public agency employees who are engaged in fire protection and law enforcement "activities." Was it the intent of the conference committee to cover by such language employees who are engaged in the rescue-ambulance services--activities of a public agency?
 MR. QUIE. The gentleman is correct that provision, section 6(c), is intended to cover those employees directly employed by a public agency who are engaged in rescue or ambulance activities which are substantially related to fire protection or law enforcement activities. In some instances these rescue or ambulance crews are a part of the fire or police department. In other cases they must be under a separate department of the same public agency, but their activities substantially include rescue and ambulance work associated with fire protection and law enforcement. In that case these employees are covered by the unique provisions of section 6(c)....
 Does the Chairman of the General Labor Subcommittee (MR. DENT) concur in that understanding?
 MR. DENT. That is correct.
 Horan v. King County, Washington, 740 F.Supp. 1471, 1476 n. 3 (W.D.Wash.1990) (quoting 120 Cong.Rec. 8598 (1974)).
 
 
 [8]
 See H.R.Rep. No. 913, 93rd Cong., 2d Sess. (1974), reprinted in 1974 U.S.C.C.A.N. 2811; H.R.Conf.Rep. No. 953, 93rd Cong., 2d Sess. (1974), reprinted in 1974 U.S.C.C.A.N. 2862
 
 
 [9]
 Idaho Sheet Metal Works, Inc. v. Wirtz, 383 U.S. 190, 209, 86 S.Ct. 737, 749, 15 L.Ed.2d 694 (1966)
 
 
 [10]
 29 C.F.R. § 553.215(a)
 
 
 [11]
 Id
 
 
 [12]
 Bond v. City of Jackson, 939 F.2d 285, 287-88 (5th Cir.1991) (quoting DOL, Wage & Hour Div., Ltr.Rul. (Oct. 9, 1987)) (emphasis omitted)
 
 
 [13]
 29 C.F.R. § 553.215(a)
 
 
 [14]
 Bond, 939 F.2d at 288 (quoting DOL, Wage & Hour Div., Ltr.Rul. (Oct. 9, 1987)) (emphasis removed)
 
 
 [15]
 The district court relied on tables provided by the plaintiffs that divided the Services' calls into medical emergencies, automobile accidents, unknown calls, fires, transfers, and crimes
 
 
 [16]
 But the district court was not furnished information as to whether there were fires, crimes, and automobile accidents in Barrow County to which the EMTs were not dispatched. See factor (3) discussed in succeeding paragraph
 
 
 [17]
 See R2-24 Exh. 4
 
 
 [18]
 The EMTs in Barrow County apparently have not had occasion to be dispatched to riots or natural disasters. Any dispatches to these types of rescues would also be properly considered. We also note that, although the district court considered dispatches to fires, it apparently did not consider what are referred to as "slow calls" to structure fires. The County has shown nothing to convince us that this is error. First, the County has not established that these "slow calls" are actually "dispatches," as opposed to merely occasions on which the EMTs ride out to the fires upon hearing of them over the radio. Second, EMTs merely standing by at a structure fire does not appear to be "substantially related" to firefighting; there is no emergency nature to such an activity
 
 
 [19]
 See Horan, 740 F.Supp. at 1480 (county did not meet the "regularly dispatched" test when service's computerized data bank indicated that less than one-half of one percent of calls were related to fire emergencies and about five percent or less were related to law enforcement emergencies)
 
 
 [20]
 See Spires, 980 F.2d at 688-89 (county did not meet "regularly dispatched" test when EMTs answered only between 17 and 35 percent of fire and police calls); Soles v. Board of Commissioners of Johnson County, Georgia, 746 F.Supp. 106 (S.D.Ga.1990) (further factual development necessary where unclear whether EMTs were regularly dispatched to fires and police calls or were dispatched only when emergency medical service was needed). To develop this third factor, it will be necessary for the County to obtain information from each of the fire departments and each of the law enforcement agencies
 
 
 [21]
 We caution the district court to distinguish between those times when the Service is dispatched to a fire from those times when the Service is dispatched with a fire department. The former are relevant to determining whether the Service is "regularly dispatched to fires" while the latter may not be. Apparently, one or more of the fire departments in Barrow County are "first responders" and may be called to accident scenes that in no way involve a fire. Calls to such scenes are not "fire protection activities" as defined in 29 C.F.R. § 553.210(a) and, therefore, should not be considered in determining whether the services provided by the EMTs are "substantially related to firefighting."
 
 
 [22]
 29 C.F.R. § 553.212
 
 
 [23]
 Wouters v. Martin County, Florida, 793 F.Supp. 310, 312-13 (S.D.Fla.1992)
 
 
 [24]
 Id. at 312 n. 2. See also Littlefield v. Town of Old Orchard Beach, 780 F.Supp. 64, 68 (D.Me.1992) ("Section 553.212 ... applies to employees described in section 553.215."); Horan, 740 F.Supp. at 1479 (applying 80/20 rule to employees brought within the section 7(k) exemption by § 553.215)
 
 
 [25]
 29 C.F.R. § 553.212(a)
 
 
 [26]
 Id
 
 
 [27]
 See R1-20 at 18-23
 
 
 [28]
 It is unclear whether these "accident hours" include time spent responding to automobile accidents. Any such time would be exempt, as it is related to fire protection or law enforcement
 
 
 [29]
 They may, however, include automobile accidents. See note 28
 
 
 [30]
 No doubt payment is usually made pursuant to the patient's insurance policy or by medicare or medicaid
 
 
 [31]
 Both the County and the district court refer to these hours as "on call" time. See 743 F.Supp. at 862 n. 1; R1-20 at 18-23. This term is misleading. "On call" generally refers to time when an employee must be available to respond to a call but may pursue his or her own personal activities and need not be in any specific location, such as the employer's place of business. See, e.g., Norton v. Worthen Van Service, Inc., 839 F.2d 653 (10th Cir.1988). Clearly, this is not what the County and the district court mean by "on call" time; when the EMTs are not responding to calls, they are at the Service headquarters performing routine maintenance tasks, reading, resting, or sleeping
 
 
 [32]
 29 C.F.R. § 553.210(c)
 
 
 [33]
 As we noted in Spires, the district court need not reach the issue of whether the plaintiffs spend more than 20% of their time in nonexempt activities if the court finds that the County failed to show that the substantial relation test has been met. 980 F.2d at 687